# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY AND ITS DIVISION OF INVESTMENT, on behalf of itself and all others similarly situated, | Civ. A. No. 14-CV-1031-DAP |
| | |
| | <u>CLASS ACTION</u> |
| Plaintiff, | |
| | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| | <u>JURY TRIAL DEMANDED</u> |
| CLIFFS NATURAL RESOURCES INC., JOSEPH CARRABBA, LAURIE BRLAS, TERRY PARADIE, and DAVID B. BLAKE, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

GLOSSARY OF DEFINED TERMS .................................................................................. iv

I.  INTRODUCTION ..................................................................................................1

II. JURISDICTION AND VENUE ...........................................................................2

III. THE PARTIES ......................................................................................................3

IV. BACKGROUND ...................................................................................................4

    A.  Cliffs Acquires Bloom Lake After Extensive Due Diligence.................................4

    B.  Cliffs Announces A Three-Phase Plan For Bloom Lake .........................................4

    C.  Defendants Under Pressure To Justify Acquisition Of Bloom Lake .......................5

        1.  The Market Is Concerned That Bloom Lake Cost Too Much ....................5

        2.  The Market Is Concerned About Falling Iron Ore Prices...........................6

        3.  The Market Is Concerned That Cliffs' Dividend Lags Behind Those Of Its Peers.................................................................................6

        4.  Carrabba, Brlas, And Blake Increase The Dividend To Appease Investors And Save Their Own Jobs.........................................7

V.  DEFENDANTS' FRAUDULENT SCHEME.......................................................7

    A.  Cliffs Raises The Dividend To Unsustainable Levels, Falsely Stating That Bloom Lake Was The Source Of Increased Cash To Maintain The Increased Dividend.................................................................................7

    B.  Defendants Falsely Claim Dividend Was "Stress Tested" .....................................8

    C.  The Increased Dividend Results In Analyst Endorsements, Shareholder Investment, And Inflated Share Price .......................................................9

    D.  The Fraud In Phase 1:  Defendants Know That Production And Cost Targets Are Impossible ........................................................................10

        1.  Q1 2012:  Carrabba Falsely States That Phase 1 Production Increases And Cost Reductions Are On Track .........................10

        2.  Q2 2012 And Investor Day:  False Assurances That Phase 1 Is On Track Despite Production Difficulties .......................................11

3.     Q3 2012:  Cliffs Falsely Represents It Can Control Bloom Lake Costs, But Acknowledges Problems With Phase 1 ................................... 13

4.     Q4 2012:  Cliffs Is Forced To Admit The Truth ........................................ 14

5.     Systemic, Undisclosed Problems Severely Hamper Phase 1 Production And Increase Costs .................................................. 15

      a.     Phase 1 Cost And Production Goals "Mathematically Impossible" Due To Chronic Shutdowns And Operational Problems ................................................................ 15

      b.     Uncontrolled Labor Headcount And Management Overlap Increase Costs And Inefficiency ................................ 18

      c.     Transportation Infrastructure Was Substantially Deficient, Causing Additional Plant Shutdowns And Increased Costs .......... 20

6.     Individual Defendants' Knowledge Of Bloom Lake's Systemic Production Problems ................................................................ 22

E.     The Fraud In Phase 2:  Defendants Conceal Nonviability Of Expansion ............. 23

1.     Defendants Falsely Assure Investors That The Bloom Lake Expansion Was "On Track" And "Going Very Well" ............................... 23

2.     Defendants Knew That The Expansion Was Not Economically Feasible ............................................................................ 25

F.     The Fraud Concerning The Dividend:  Dividend Never "Stress Tested" Or Sustainable ............................................................................ 26

1.     Defendants Falsely Assure Investors That Dividend Was "Stress Tested" And "Extremely Sustainable" ....................................... 27

2.     Defendants Knew That The Dividend Was Never Properly Stress Tested Or Sustainable ................................................... 29

G.     Defendants Forced To Slash Dividend By 76% ............................................. 31

1.     Defendants Attribute Dividend Decrease To Problems At Bloom Lake ................................................................................ 31

2.     Defendants Also Falsely Blame Iron Ore Pricing "Volatility" ................. 32

3.     The Market Reacts To Cliffs' Revelations ................................. 33

VI.     POST-CLASS PERIOD DEVELOPMENTS ................................................... 34

      A.     Individual Defendants Forced To Resign ................................................34

      B.     Bloom Lake's Phase 2 Expansion Shut Down ....................................34

      C.     Activist Shareholder Casablanca Wins Proxy Fight.............................35

      D.     Bloom Lake Now Shuttered And Bankrupt...........................................35

VII.     SUMMARY OF SCIENTER ALLEGATIONS.................................................36

VIII.    LOSS CAUSATION ........................................................................................42

IX.      THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .........46

X.       THE PRESUMPTION OF RELIANCE..........................................................46

XI.      CLASS ACTION ALLEGATIONS ................................................................47

XII.     CAUSES OF ACTION.....................................................................................48

XIII.    PRAYER FOR RELIEF ...................................................................................50

XIV.   JURY DEMAND.............................................................................................50

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|------|------------|
| Blake | Individual Defendant David Blake, Cliffs' former Senior Vice President, North American Iron Ore Operations |
| Bloom Lake | A mine located in Quebec, Canada, which Cliffs acquired in May 2011 as part of the Consolidated Thompson acquisition |
| Brlas | Individual Defendant Laurie Brlas, Cliffs' former Chief Financial Officer and Executive Vice President and, from October 1, 2012 until July 9, 2013, President of Global Operations |
| Capex | Capital expenditures |
| Carrabba | Individual Defendant Joseph Carrabba, Cliffs' former Chairman, Chief Executive Officer, and President |
| CAD | Canadian dollar(s) |
| CAO | Chief Accounting Officer |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | March 14, 2012 through March 26, 2013, inclusive |
| Cliffs or the Company | Defendant Cliffs Natural Resources, Inc. |
| CW | Confidential Witness. Confidential Witnesses are referred to numerically (e.g., "CW1") as set forth in Appendix B to the Complaint, entitled "Confidential Witness Appendix." |
| Defendants | Collectively, Cliffs and the Individual Defendants |
| EVP | Executive Vice President |
| Exchange Act | The Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* |
| Individual Defendants | Collectively, Defendants Terrance Paradie, Joseph Carrabba, Laurie Brlas, and David Blake |
| Lead Plaintiff, Plaintiff, or New Jersey | The Department of the Treasury of the State of New Jersey and its Division of Investment |
| NYSE | The New York Stock Exchange |
| Paradie | Individual Defendant Terrence Paradie, Cliffs' Chief Financial Officer |
| PSLRA | Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 |
| Q1 | First quarter |
| Q2 | Second quarter |
| Q3 | Third quarter |

| Term | Definition |
|------|-----------|
| Q4 | Fourth quarter |
| Rule 10b-5 | SEC Rule 10b-5 of the Securities Exchange Act of 1934, codified at 17 C.F.R. 240.10b-5 |
| Section 10(b) | Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) |
| Section 20(a) | Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) |
| SVP | Senior Vice President |
| Three-Phase Plan | Bloom Lake Phase 1, Phase 2, and Phase 3 |

Lead Plaintiff,[1] by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based on the independent investigation by its counsel.[2]

## I.  INTRODUCTION

1.      This is a federal securities class action brought on behalf of purchasers of Cliffs' publicly traded common stock during the Class Period (March 14, 2012 through March 26, 2013, inclusive).  The claims asserted herein are alleged against Cliffs and its former CEO Carrabba; former CFO Brlas; former SVP, North American Iron Ore Operations, Blake; and current CFO Paradie; and arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

2.      In May 2011, Cliffs acquired a controlling interest in Bloom Lake, unveiling plans for a three-fold increase in the mine's production capacity coupled with dramatic production cost reductions.  However, investors and analysts immediately criticized the acquisition, leaving Defendants with enormous pressure to allay market concerns.

3.      At the start of the Class Period, Cliffs announced a massive 123% dividend increase. Defendants claimed that this dividend had been thoroughly "pressure-tested," and they falsely represented that it was "extremely sustainable" due to the additional cash flow to be generated by Bloom Lake.  The dividend increase served Defendants' intended purpose:  making Cliffs' shares extremely attractive to investors through the illusion that Bloom Lake would generate enough cash to fund the huge dividend and also finance an expansion that would triple the mine's production volume and substantially reduce production costs.

4.      To further lull investors, Defendants also repeatedly misstated and omitted material facts regarding the deteriorating conditions at Bloom Lake.  The truth, known to or recklessly

---

[1] All capitalized, defined terms used in this Complaint have the meanings set forth in the Glossary, *supra* at p. iv.

[2] This investigation included, but was not limited to, a review and analysis of:  (i) Cliff's public SEC filings; (ii) research reports by securities and financial analysts; (iii) transcripts of Cliffs' earnings conference calls and industry conferences; (iv) economic analysis of Cliffs' securities movement and pricing data; (v) information obtained from former Cliffs' employees and other knowledgeable individuals throughout the course of the investigation; and (vi) other publicly available material and data identified herein.  Many of the relevant facts are known only by the Defendants, or are exclusively within their custody or control.

disregarded by Defendants but misrepresented to and hidden from investors, was much different. Defendants knew that Bloom Lake was operating in severe distress, and could not possibly support the increased dividend or generate the cash needed to fund the Company's Three-Phase Plan.  The mine was plagued by operational breakdowns, including a frequently broken "concentrator" (the key machinery necessary for ore processing), inadequate transportation infrastructure, and inefficient management and contract labor.  By March 2012, Defendants already knew that the annual 2012 production levels promised to investors were "mathematically impossible."

5.     Defendants also knew that Cliffs' expansion plans were over budget and behind schedule.  The combination of problems in the operation and expansion of Bloom Lake created a massive cash flow drain that was in direct conflict with the continuation of the huge dividend. Notwithstanding their access to and knowledge of these facts, Defendants hid them from the Class.

6.     The true economics of the situation slowly emerged.  Defendants issued a series of half-truths about production volume and cost setbacks at Bloom Lake, but knowingly or recklessly omitted material facts.  Then, Defendants rolled back their expansion plans at the mine.  Next, less than a year after increasing the dividend and repeatedly reassuring the public that it had been tested and was sustainable, they cut the dividend by 76%, which, along with the other bad news, resulted in enormous reductions to the price targets of Wall Street analysts.  Cliffs' share price plummeted over 73%, causing devastating losses to the Class.

7.     Recent news further confirms the disaster concealed during the Class Period:  all but one of the Individual Defendants has been removed, the Board has been taken over, and Cliffs has failed to sell or attract capital to Bloom Lake, which was first shut down at an astounding cost of $650-$700 million, and now has been placed into bankruptcy.

II.    **JURISDICTION AND VENUE**

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Cliffs maintains its executive offices in this District, and many of the acts and conduct complained of herein occurred in and/or were issued from this District.

## III.    THE PARTIES

10.     Lead Plaintiff manages approximately $76.8 billion in public pension funds for the benefit of approximately 769,000 current and retired employees of the State of New Jersey.  Lead Plaintiff purchased shares of Cliffs' common stock on the NYSE during the Class Period and suffered damages due to violations of the federal securities laws alleged herein.

11.     Defendant Cliffs, an Ohio corporation, is an international mining and natural resources company that derives substantially all of its revenue from producing and selling iron ore and coal.  Cliffs maintains its principal executive offices at 200 Public Square, Cleveland, Ohio 44114.  The Company's common stock trades on the NYSE, which is an efficient market, under the ticker symbol "CLF."  Cliffs currently has over 153 million shares of common stock outstanding as well as preferred shares, options, and several classes of debt securities.

12.     Defendant Carrabba was Cliffs' Board Chairman, President, and CEO during the Class Period.

13.     Defendant Brlas was a senior officer of Cliffs during the Class Period.  Specifically, until October 1, 2012, Brlas was Cliffs' EVP and CFO.  From October 1, 2012 until July 9, 2013, Brlas served as EVP and President of Global Operations.

14.     Defendant Paradie is, and was during the Class Period, a senior officer of Cliffs. Paradie was appointed Cliffs' CFO on October 1, 2012, a position he still holds.  Prior to his appointment as CFO, Paradie served as the Company's Corporate Controller and CAO.

15.     Defendant Blake was Cliffs' SVP, North American Iron Ore Operations during the Class Period.

16.     The Individual Defendants, because of their positions with Cliffs, possessed the power and authority to control the contents of Cliffs' reports to the SEC, press releases, and investor presentations.  Each of the Individual Defendants was provided with copies of the Company's reports

and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information, each of the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.

## IV.   BACKGROUND

### A.   Cliffs Acquires Bloom Lake After Extensive Due Diligence

17.     On January 11, 2011, Cliffs announced its plan to acquire a 75% interest in Consolidated Thompson, including its signature asset, Bloom Lake. After conducting extensive due diligence on Bloom Lake, Cliffs successfully completed the acquisition on May 12, 2011, for $5 billion (CAD) -- the largest acquisition in Cliffs' history. Cliffs operated Bloom Lake out of offices in Montreal, Canada and Cleveland, Ohio.

18.     According to CW10 -- a Financial Controller at Cliffs' neighboring Wabush mine from November 2001 until November 2011 -- due diligence was all run out of Cliffs' Cleveland headquarters. CW29, a Business Support Manager, who worked for Cliffs' Eastern Canadian Iron Ore division from December 2010 until August 2013, dividing CW29's time between Bloom Lake and Montreal, and whose work mostly involved the financial aspects of Bloom Lake and Cliffs Quebec Iron Mining Limited, confirmed Blake was part of the Bloom Lake due diligence team.

### B.   Cliffs Announces A Three-Phase Plan For Bloom Lake

19.     At the time of Cliffs' May 2011 acquisition of Bloom Lake, a Three-Phase Plan had been put into place to increase production at the mine, referred to as Phase 1, Phase 2, and Phase 3. Phase 1 would increase iron ore production to 8 million tons per year during the first half of 2012.

20.     Phase 2 called for doubling the production at Bloom Lake to 16 million metric tons of iron ore concentrate per year by 2014. The Company stated that Phase 2 Capex would be $525 million, to be funded by cash flow supposedly generated by the increased production from Phase 1.

21.     Phase 3 called for increasing production to 24 million tons in the 2015-2016

timeframe, requiring approximately $600 million in additional Capex.

      C.    **Defendants Under Pressure To Justify Acquisition Of Bloom Lake**

          1.    **The Market Is Concerned That Bloom Lake Cost Too Much**

22.    Soon after the acquisition, analysts raised concerns that Cliffs had overpaid for Bloom Lake. For example, on June 22, 2011, BMO Research estimated that Cliffs paid ***$2 billion too much.*** In a January 26, 2012 analyst report downgrading Cliffs from "Outperform" to "Neutral," Credit Suisse similarly described Cliffs as "*having paid far too much.*" (Emphasis added.) On February 16, 2012, BB&T Capital Markets observed the "*investor criticism regarding the prices and transaction multiples paid for recent acquisitions,*" including Consolidated Thompson's iron mines. (Emphasis added.)

23.    As a result of these concerns, it was critically important for Defendants to justify to investors the high price for Bloom Lake by ostensibly generating substantial returns on that investment, and convincing the market that the Three-Phase Plan was on track. Indeed, as RBC Capital Markets observed on January 5, 2012: "*[A]chieving full production of the first phase of the project is one of the keys to realizing full value for the acquisition of Consolidated Thompson.*" (Emphasis added.)

24.    Accordingly, throughout 2011, Defendants touted Bloom Lake as a valuable asset, and emphasized their production and expansion plans for the mine. For example, six weeks after the acquisition, during Cliffs' earnings conference call for Q2 2011, Carrabba stated, Cliffs is "well on [its] way to reaching the 8 million ton annual production rate" and the Phase 2 "ramp-up to 16 million tons is also ***on track*** and still slated to be completed in the latter part of 2013." (Emphasis added.)

25.    Defendants touted margin increases that would be achieved by reduced production costs at Bloom Lake. For example, on October 28, 2011, during Cliffs' earnings call for Q3 2011, Brlas stated: "Impressively during the third quarter, Bloom Lake contributed approximately $155 million in cash sales margin to the company's results." On the same call, Brlas stated that cash costs at Bloom Lake would "be approximately $60 per ton by year end."

26.     Throughout the latter half of 2011 and early 2012, analysts responded positively to Defendants' representations.  For example, JPMorgan remarked on August 3, 2011 that Bloom Lake production would double "toward the latter part of 2013" and that the increased volume would provide additional sales margin sufficient "to pay for the [C]apex needed to expand the facility."

### 2.     The Market Is Concerned About Falling Iron Ore Prices

27.     At the same time that the Company was promoting its Three-Phase Plan, beginning in the latter half of 2011, iron ore prices began to fall.  Before the beginning of the Class Period, Cliffs transitioned from a business model of long-term fixed price contracts to "spot pricing" for more of its Eastern Canadian iron ore business, where pricing was determined by the market price of ore at the time of each individual shipment.  Using spot pricing meant that Cliffs' financial performance was far more susceptible to a negative impact from falling iron ore prices than it had ever been before, and it was essential that Cliffs was able to accurately model the price of iron ore in order to adequately predict its cash flow.

28.     Investors and analysts were concerned about the effect of falling iron ore prices on Cliffs' financial performance, which was compounded by the transition to spot pricing.  For example, on October 21, 2011, Morgan Stanley cautioned investors to "*stay on the sidelines until iron ore prices stabilize.*"  Six days later, Deutsche Bank warned:  "Iron ore forward curves imply 2012E average prices have fallen ~$20/t (or 13%) over the past 2 months. . . .  Nearly 50% of Cliff's total iron ore volumes (Canada and Asia Pacific) are now subject to spot-driven seaborne iron ore pricing for which we use iron ore forward curves as a proxy for future prices."

### 3.     The Market Is Concerned That Cliffs' Dividend Lags Behind Those Of Its Peers

29.     In early 2012, before the start of the Class Period, the market was also concerned that Cliffs' dividend was lower than comparable companies.  For example, a January 5, 2012 RBC Capital Markets report contained a graph depicting Cliffs' dividend as low for a mining company; the same RBC analysts noted positively that "Cliffs' current objective is to bring its dividend payout in line with its global peers."  In other words, Defendants needed Cliffs' dividend to be on par with

or greater than the dividends of its peers to compete for investors.

### 4. Carrabba, Brlas, And Blake Increase The Dividend To Appease Investors And Save Their Own Jobs

30.     As senior executives of the Company at the time of the Bloom Lake acquisition, Carrabba, Brlas, and Blake staked Cliffs' future, and their own livelihoods, on the success of the Bloom Lake acquisition.  To defend their decision to acquire the mine, and assuage investors' concerns regarding Bloom Lake's high price, the impact of falling iron ore prices on Cliffs' financial performance, and the level of the dividend, Carrabba, Brlas, and Blake were motivated to justify the Bloom Lake acquisition by fabricating the success of the Three-Phase Plan and increasing Cliffs' dividend to unsustainable levels.

31.     Steve Raguz -- SVP, Corporate Strategy and Communications & Chief Strategy Officer, from October 1, 2012 through May 2013, and SVP, Corporate Strategy and Treasurer, from February 1, 2011 until October 2012, who reported to Carrabba from October 1, 2012 through the end of the Class Period and to Brlas from February 2011 until October 2012 -- conducted a great deal of research that indicated a higher dividend could help Cliffs retain investors.  Indeed, according to CW7 – an International Tax Director at Cliffs from approximately April 2011 through March 2013, who worked with Cliffs' Treasury Department on global cash management – Raguz presented this research at a meeting of the Finance Department and upper management toward the end of 2011, after which the Company decided to significantly increase the dividend.

## V.    DEFENDANTS' FRAUDULENT SCHEME[3]

### A.    Cliffs Raises The Dividend To Unsustainable Levels, Falsely Stating That Bloom Lake Was The Source Of Increased Cash To Maintain The Increased Dividend

32.     On March 13, 2012, Cliffs announced that its dividend would increase ***an astounding 123%*** (from $0.28/share quarterly to $0.625/share ($2.50 annually)), pointing to Bloom Lake as the source of cash that would support the dividend.  Cliffs' dividend yield vaulted to the top of its metals and mining peer group, and now sat near the top 10% of all companies in the S&P 500 Index.  The

---

[3] A chart containing all of the statements Lead Plaintiff alleges to be false and misleading, along with the bases for falsity and scienter, is attached hereto as Appendix A.

Class Period begins the next day, March 14, 2012, the first trading day after the announcement.

33.     In the Company's March 13, 2012 press release, Carrabba falsely stated that the Company's "strong financial profile and cash flow generation will allow us *to increasingly return large amounts of capital to our shareholders, while at the same time, fund capacity expansions* already underway in Eastern Canada and other geographies." (Emphasis added.)  Similarly, during a conference call with investors on March 14, 2012, Carrabba stated that Bloom Lake was a *"premium asset,"* given its *"low-cost space for a production base"* and its *"rail and port infrastructure."* (Emphasis added.)  As Carrabba put it, Bloom Lake gave the Company *"an immediate 8 million ton footprint in this geography and a pathway to 16 million tons in 2013."*  (Emphasis added.)

34.     During the same March 14, 2012 conference call, Brlas credited Bloom Lake as the source of cash that would sustain the dividend, stating:  "Our operating cash generation in 2013 and beyond continues on to higher levels, driven primarily from increased volume from Bloom Lake mine as we expand from 8 million tons to 16 million tons, making us confident *the dividend increase announced today is **extremely sustainable."***  (Emphasis added.)

35.     In reality, as detailed below, Defendants knew that (i) Bloom Lake suffered from numerous, costly, undisclosed operational difficulties in Phase 1, making it impossible for Defendants to simultaneously fund the Phase 2 expansion and the dividend increase; and (ii) Phase 2 itself was beset with rampant cost overruns, rendering the expansion economically infeasible.

**B.     Defendants Falsely Claim Dividend Was "Stress Tested"**

36.     Cliffs also sought to persuade the market that the dividend increase correctly reflected the Company's cash position by falsely stating that the dividend had been "stress-tested" and that the Company's price modeling took into account the price of iron ore.  For example, during the March 14, 2012 conference call, Brlas stated that the dividend had been ***"tested [under] a wide variety of [iron ore] pricing scenarios over the coming years."***  (Emphasis added.)

37.     Moreover, on the same call, Brlas publicly dismissed concerns that Cliffs' move to spot-pricing contracts affected the sustainability of the dividend, stating:

        One of the things that we did was ***a significant amount of analysis***

over various periods of the cycle that we've seen and what we might expect in order to be comfortable that we are now at a size and a scale that *even over a variety of iron ore pricing scenarios, we're still comfortable with this dividend level*.  (Emphasis added.)

38.     In reality, as detailed below in § V.F, Cliffs lacked price modeling capabilities that effectively accounted for the price of iron ore, and Cliffs could not adequately test its dividend. Indeed, according to CW7 -- who examined Cliffs' price forecasting models in connection with a project to assemble iron ore pricing data for use with eventual submissions to Australian tax authorities and who separately provided cash tax inputs in connection with Defendants' stress-testing of the dividend -- Brlas herself admitted during an internal meeting with Carrabba and CW7 in the summer of 2012 that Cliffs' historic pricing numbers "did not have the rigor behind it we should have."

**C.      The Increased Dividend Results In Analyst Endorsements, Shareholder Investment, And Inflated Share Price**

39.     Carrabba, Brlas, and Blake's plan to assuage investor concerns by raising the dividend was successful.  Following Cliffs' March 13, 2012 announcement, numerous analysts recommended Cliffs' stock because of the Company's dividend increase and prospects for growth, noting that Cliffs was now in line with its peers.  For example, UBS reported on March 13, 2012: "We expect th[e] announcement [of the 123% dividend increase] to be *well received by investors as returning cash to shareholders* . . . .  [Cliffs'] beefed up dividend will be among the highest in the metals & mining space (almost double S&P 500's 2.1% div yield) and may attract a new class of investor – also a positive."  (Emphasis added.)

40.     The market also accepted Defendants' assurances that Bloom Lake would generate sufficient cash to maintain the dividend and that the dividend had been tested.  For example, on March 14, 2012, Dahlman Rose & Co. reported:  *"We believe that the dividend is sustainable even under somewhat lower iron ore prices."*  (Emphasis added.)  CIBC World Markets further stated on March 22, 2012:  *"We believe growth will come primarily from the newly acquired Bloom Lake mine . . . ."* (Emphasis added.)

41.     As a result of Defendants' materially false and misleading statements and omissions,

on March 14, 2012, Cliffs' common stock closed at $69.50 per share, up 7% from the previous day's closing price of $64.91. Cliffs' common stock continued to appreciate, closing at $72.00 per share on March 15, 2012.

### D. The Fraud In Phase 1: Defendants Know That Production And Cost Targets Are Impossible

42. Defendants' initial statements about Bloom Lake and the dividend increased internal pressure to perpetuate the Company's lie that Phase 1 would generate enough cash-flow to fund the increased dividend, while simultaneously financing the capital-intensive Phase 2 expansion. In actuality, and as discussed below, Bloom Lake was experiencing rampant shutdowns that prevented the mine from running efficiently and achieving its production rate of 8 million tons per year, and resulted in increased costs due to maintenance and repairs. Bloom Lake also suffered from serious problems with its production and transportation infrastructure and with mismanagement and labor at the mine. The combination of these issues made it impossible for Bloom Lake to achieve annual production of 8 million tons, or to reduce cash-per-ton costs to $60 in Phase 1.

43. Nonetheless, and despite their knowledge or reckless disregard of systemic issues at Bloom Lake, Defendants omitted this material information and repeatedly misled investors to believe during the Class Period that Phase 1 was on track, concealing and minimizing the mine's problems.

### 1. Q1 2012: Carrabba Falsely States That Phase 1 Production Increases And Cost Reductions Are On Track

44. Carrabba admitted publicly during Cliffs' April 26, 2012 earnings conference call that "cash costs at Bloom Lake are higher than expected." However, the Company continued to falsely assure investors that (i) Phase 1 was on track; (ii) a $60 per ton cash cost in Phase 1 would be achieved; and (iii) difficulties with the production infrastructure at the mine had been resolved.

45. For example, during the April 26, 2012 conference call, Carrabba represented that *"we have increased Bloom Lake's production reliability."* (Emphasis added.) Morever, Carrabba further stated that reduced costs were just around the corner, because the Company had "a plan in place" to lower the costs of, and capitalize on, Bloom Lake. Relying on this "plan," Carrabba assured investors that *"our Phase 1 cash cost target of $60 per ton is still realistic and achievable."*

(Emphasis added.)

46.     With respect to the production issues and the increased costs in Q1 2012, Carrabba falsely attributed these problems to a fire that caused a temporary shutdown, which he spun to Bloom Lake's advantage:  "[While the fire had] resulted in production downtime of approximately 10 days . . . we used the downtime to advance planned maintenance, originally slated for the second quarter."  As a result, Carrabba stated:  "By compressing maintenance planned for future quarters, we expect to recover some of the production loss throughout the remainder of the year."   Moreover, despite knowledge of numerous production problems during Cliffs' first year overseeing the operation and expansion of Bloom Lake, Carrabba was emphatic in denying that there were problems at the mine:  "We're very satisfied with the project we bought from Consolidated Thompson.  ***We have not found any fatal flaws, if you will, or even major flaws in the flow sheet.***"  (Emphasis added.)  By doing so, Carrabba misrepresented the true facts and omitted to disclose material information about the full scope of the production problems to investors.

47.     Numerous analysts credited Carrabba's false explanation, along with Carrabba's false assurances that cash costs of $60 would still be achieved in Phase 1.  For example, RBC Capital Markets concluded on April 26, 2012:  "Bloom Lake cash costs sky rocket due to fire, but expected to fall to average of $60/tonne in H2/2012."

48.     In reality, the fire was a one-time event and not the sole cause of Bloom Lake's high production costs, which continued to increase throughout the Class Period, including in the quarters after the fire, due to systemic, undisclosed problems discussed below.

**2.      Q2 2012 And Investor Day:  False Assurances That Phase 1 Is On Track Despite Production Difficulties**

49.     On July 25, 2012, Cliffs announced its earnings results for Q2 2012, in which it reported higher than expected cash costs at Bloom Lake of $91 per ton on 1.4 million tons of iron ore, and reduced the expected annual production of the Phase 1 facility from 8 million to 7.2 million tons.  While these disclosures partially corrected Defendants' prior misstatements concerning Phase 1, including Phase 1's ability to generate 8 million tons, Defendants continued to misrepresent and

omit material facts about conditions at the mine and to falsely assure investors that Phase 1's cash-cost per ton goal of $60 was achievable.

50.     For example, during Cliffs' July 26, 2012 earnings conference call for Q2 2012, Carrabba misrepresented that Bloom Lake's higher costs were driven by Cliffs' purportedly strategic decision to produce a new "premium product" with a lower silica content.  In fact, as detailed below in § V.D.5, Carrabba omitted that the iron ore's silica content was a serious production problem, resulting in, among other issues, equipment breakdowns and an unprecedented number of shutdown days, thereby contributing to Cliffs' inability to increase Phase 1 production or reduce costs.

51.     Nonetheless, Defendants continued to falsely assure investors that the Company would stabilize costs per ton at Bloom Lake to $60-65 in late 2012.  For example, Brlas stated: "The team remains confident that goal [of a cash-cost of $60-65 per ton in the last month of 2012] can be achieved."  After providing a detailed description of cost savings to be achieved from the mine's operations and equipment, including the tailings pond and dock, Carrabba reiterated: "[T]here is a plan on the cost reduction, *it's just not a wish and a hope, if you will."*  (Emphasis added.)

52.     While analysts expressed disappointment regarding the Company's Q2 2012 results, Carrabba's assurances successfully convinced the market that Cliffs would still be able to achieve "steady-state costs [] in the $60-$65/tonne range," as reported by RBC analysts on July 26, 2012.

53.     On July 31, 2012, Cliffs held an "Analyst and Investor Day" to highlight its growth projects in Canada, including Bloom Lake.  During that conference, Defendants continued to falsely represent to investors that costs in Phase 1 would be reduced to $60 per ton.   For example, Brlas represented, *"[A]s we said last week, we expect our cash cost to settle out between $60 and $65."*  (Emphasis added.)  In response to an analyst asking, "[D]o you foresee any delays to getting to that $65 or could you end up at $80 for some reason or -- ," Blake reiterated, ***"[N]o, I don't see it going to $85."***  (Emphasis added.)

54.     Defendants also falsely represented production conditions at Bloom Lake, including the quality of the mine's equipment and infrastructure.  For example, Blake represented that Bloom Lake's concentrator (an extremely important machine that turns the raw material into iron ore

concentrate) was "fantastic."  Blake stated, "We have an operating concentrator . . . .  This is the future of concentrating."  Similarly with respect to the mine's transportation infrastructure, which enabled the transport of iron ore concentrate from the production site to trains and boats for sale to consumers, Blake stated that those facilities "are working quite well."

55.     Again, the market reacted positively to these assurances.  For example, UBS reported on July 31, 2012 that Cliffs had a "very clear, detailed plan to reduce cash costs from $95/t to $63/t by the end of the year, much of which is attributed to improvements in vols."  Macquarie (USA) Research reported, after attending Cliffs' Investor Day:  "We reiterate our [outperform] rating and [target price] of $61.  Following the visit, we are incrementally more positive that [Cliffs] can overcome cost issues at Bloom Lake during 2H2012 and we see currently elevated costs as temporary."

56.     In reality, as detailed below in § V.D.5, Bloom Lake suffered from numerous, costly, undisclosed operational problems, including problems with the concentrator frequently breaking down, as well as frequent shutdowns of the rail track, which inhibited production and increased costs, rendering Phase 1's production volume and cash cost goal of $60-65/ton impossible.

### 3.    Q3 2012:  Cliffs Falsely Represents It Can Control Bloom Lake Costs, But Acknowledges Problems With Phase 1

57.     On October 1, 2012, Paradie took over as CFO for Brlas, and Brlas became President of Global Operations.  On October 24, 2012, after the close of the market, the Company disclosed its results for Q3 2012.  Bloom Lake's cash cost for the quarter was $88 per ton on 1.4 million tons of iron ore, nearly a third higher than the $60 per ton Defendants had repeatedly promised to investors.

58.     In addition, when the Company held its earnings conference call for Q3 2012 the next day, Carrabba announced that the Company had reduced its expected production volume in its Eastern Canadian business segment yet again "to approximately 8.9 million tons from our previous expectation of 9.2 million tons."  Nonetheless, Paradie stated that, in only two months, Cliffs "expect[s] to exit the year producing at an annualized rate of *7.2 million tons* and *a mid-$60 cash cost per ton*."  (Emphasis added.)

59.     Again, the market reacted positively to Defendants' assurances.  For example, on October 25, 2012, Credit Suisse reported "[n]o change to Bloom Lake guidance" as a "key positive," noting that Bloom Lake's "dirty laundry" had been "air[ed]" in July/August.

60.     But Cliffs was still hiding much more dirty laundry.  On November 19, 2012, the Company publicly disclosed significant adjustments to its 2013 operating plan, effectively admitting that the Bloom Lake project was encountering serious problems.  Cliffs reduced its estimates for annual production at Bloom Lake's Phase 1 facility from 7.2 million tons to 7.0 million tons, and as discussed below, suspended the Phase 2 expansion.  Nonetheless, Defendants failed to disclose the full extent of the operational problems in Phase 1, falsely attributing the production decrease to "increased iron pre pricing volatility and lower Northern American steelmaking utilization rates."  In reality, as described in § V.D.5 below, Bloom Lake's inability to achieve its Phase 1 production goals was due to rampant operational problems that resulted in skyrocketing costs, not iron ore pricing volatility.  Indeed, in November 2012, iron ore prices were rising and were no more volatile than at any other time during the Class Period, as described in § V.G.2 below and Appendix C.

### 4.      Q4 2012:  Cliffs Is Forced To Admit The Truth

61.     On February 12, 2013, after the close of trading, Cliffs issued a press release announcing its Q4 and full-year 2012 earnings results.  On the next day, February 13, 2013, Carrabba stated on Cliffs' earnings conference call that the Company had dramatically cut its dividend, attributing the decrease to the ongoing inability to generate a profit or reduce costs at Bloom Lake.  Carrabba stated, "[W]e recognize that Bloom Lake is taking longer to ramp-up than we originally expected.  This has directly impacted our profitability in the near term."  Carrabba further stated that Bloom Lake's cash cost continued to soar at $86 per ton on 1.4 million tons of iron ore, due to higher fuel, contract labor, and maintenance supply costs.  Paradie disclosed on the same call that Bloom Lake's per-ton cash cost was in the low $70s at year-end – significantly higher than the targeted $60-65 range – and further, that Bloom Lake's cash costs would jump to $85-90 in 2013.

62.     However, as discussed below at § V.G.2, Defendants did not reveal the full truth to the market, because during the Company's February 13, 2013 earnings call, Carrabba continued to

lay a portion of the blame for Cliffs' difficulties on "the volatile pricing we experienced in the second half of 2012."

> ### 5. Systemic, Undisclosed Problems Severely Hamper Phase 1 Production And Increase Costs

63. As reported by multiple CWs, contrary to Defendants' representations above, Bloom Lake's systemic problems made it impossible to achieve a Phase 1 production goal of 8 million tons of iron ore per year, while simultaneously decreasing costs to $60 per ton.

> #### a. Phase 1 Cost And Production Goals "Mathematically Impossible" Due To Chronic Shutdowns And Operational Problems

64. CW1 -- a Section Manager, Maintenance Plant, Iron Ore Mining at Bloom Lake from May or June 2011 until 2012, and an Area Manager, Reliability Maintenance and Business Improvement Manager at Bloom Lake from 2012 until September 2013, who was charged with advising Bloom Lake management about necessary improvements to the mine's infrastructure -- stated that by approximately March 2012, it was "***mathematically impossible***" for Bloom Lake to achieve its 2012 volume production goal due to the number of shutdowns that had already occurred that year. (Emphasis added.) According to CW1, in order to achieve its 2012 production goal, Bloom Lake needed to have fewer than 20 shutdown days for the whole year. As of approximately March 2012, CW1 explained, Bloom Lake had already had 45 shutdown days.

65. CW10, who attended budget preparation meetings in Montreal approximately 2-3 times per month from June 2011 until October 2011, during which various production issues for the Canadian iron ore operations, including Bloom Lake, were discussed, confirmed that Bloom Lake did not have the physical capacity to run at 8 million tons per year. During these Montreal meetings, which were attended by individuals from Cliffs' Cleveland headquarters, attendees brought up the concern that Bloom Lake's equipment availability was overly optimistic. CW10 stated that these concerns were not adequately addressed. According to CW10, the issues with the physical equipment at Bloom Lake were well-known and well-understood internally by the summer of 2011 – months prior to Cliffs' decision to raise the dividend.

66.     CW29 confirmed that from the beginning of Phase 1, and by at least September 2011, the first budgeting period, it was clear that Bloom Lake could not achieve its 8.0-million-ton production goal.  CW29 explained that Bloom Lake "was never designed for and would never reach" 8.0 million tons per year, and that to state otherwise "was misleading."

67.     Nor was the goal of achieving a production cost level of $60/ton achievable.  CW2, an Exploration Manager for Cliffs' Eastern Canada operations from December 2011 through January 2013, who was based in Montreal, worked with the individuals who controlled Bloom Lake, and traveled to Bloom Lake at least once a month to attend meetings concerning the problems at Bloom Lake, confirmed that Phase 1's goal of reducing costs to $60 per ton was impossible.  CW2 personally knew and spoke with the individuals who were preparing the mine plan, including CW2's good friend, Joseph Kraft, who was the mining engineer, and those individuals could not work out a way to produce finished product at $60/ton in light of the nature of the operating costs and the inefficiencies of the mining operations and plant.

68.     By October and November 2012, it seemed that under no scenario could Bloom Lake achieve the projected volume at a cost of $60 per ton.  CW2 explained that this information was in the mine plan, which was put in an economic model for the financial controllers at Bloom Lake, and reviewed by upper management in Montreal.  Indeed, according to CW29, when the Company first stated it could reach $60-per-ton cash costs at Bloom Lake, CW29 and CW29's colleagues were skeptical: "We all laughed. . . .  60 was [] an internal joke.  That was the objective pushed to us.  That wasn't realistic.  As analysts, we didn't believe in it.  Production didn't believe in it as well."  CW29 reiterated, "We knew what the mill was capable of, what the ore body was, and the pace.  We studied these costs."  According to CW25 -- a Senior Project Manager at Bloom Lake from February 2008 until September 2013, who managed the IT integration of the mine and personally traveled to Bloom Lake around the time of the acquisition -- Carraba, Brlas, and Blake were ultimately responsible for overseeing costs at Bloom Lake.

69.     Bloom Lake's failure to meet production volume or cost reduction goals was also due, in part, to frequent breakdowns of key equipment at the mine during the production process.

That process consisted of three main steps:  (i) raw material was mined from the pit; (ii) put into a "crusher," which turned the raw materials into powder; and (ii) that powder was mixed with water and placed in the concentrator, which separated the iron ore from other materials.  Contrary to Blake's July 31, 2012 representations that the concentrator was "fantastic," "operating," and the "future of concentrating," Bloom Lake's concentrator routinely broke down, resulting in production delays and increased costs, including the cost of repairing the broken equipment.

70.    The main cause of the concentrator breakdowns at Bloom Lake was the high silica content of the mine's iron ore.  As CW11, a Chef D'Equipe Magasinier [Chief of Equipment Supply] at Bloom Lake from August 2011 to May 2013, who worked at Bloom Lake's warehouse and as a plant team leader, explained, typical iron ore is very soft, but high silica iron ore is very hard. Beginning in approximately late 2011, the higher silica content in the ore at Bloom Lake routinely caused the mine's concentrator to have major breakdowns, because the concentrator was not designed to process the harder ore.  CW11 further explained that when the concentrator broke down, it became necessary to shut down the entire plant.[4]  The impact of the concentrator break-downs on production was that *the monthly output of product was reduced by 40-50%.*  In addition to decreasing the output of product, the concentrator breakdowns also caused production costs to increase because repairing the concentrator was expensive.  CW11 stated that *repairing the concentrator could cost as much as running the machine itself.*

71.    In addition to its inability to handle the high silica content in Bloom Lake's iron ore, the concentrator experienced other problems that also resulted in increased costs and production delay.  For example, according to CW14, the supervisor of the Bloom Lake warehouse from April through October 2010, who has over three decades of experience in the mining industry, there were a lot of dangerous vibrations in the concentrator, which caused the structure to experience additional wear and tear.  Specifically, CW14 learned from a specialist who was hired to analyze the vibrations

---

[4] CW11 explained that every time the plant was shut down, there was an email or internal memo sent to the mine workers concerning "shutdown readiness" to discuss what to do to prepare for the shutdown, and after the shutdown, there was a debriefing meeting attended by the heads of each of the plant's departments.

in the concentrator that due to these vibrations, the concentrator experienced wear similar to five years of usage for every 21 months it was in service.[5]

72. Bloom Lake's production and cost problems resulted in shortfalls that were reflected in revenue and other reporting sent to Cliffs' headquarters and known or accessible to the Individual Defendants. For example, CW27 -- a Senior Director of Global Tax from May 2012 through September 2013 -- also described regular revenue reports that were distributed to the CFO. CW27 explained that a lot of Bloom Lake's accounting was done in the Cleveland headquarters, where Cliffs' accounts payable and accounts receivable was centralized. From what CW27 saw of Bloom Lake's revenue reporting, "[i]t was evident in the financial resolve of it that they weren't getting out of the mine what was originally anticipated."

73. CW29 similarly stated that Bloom Lake's production and cost information was compiled into monthly reports. These reports were sent to Jason Petrik, Group Controller, Northern American/Eastern Canada Iron Ore Business Unit during the Class Period, who reported to Brlas.

74. Around the end of Q2 2012, CW7 stated, it was discussed in management meetings that "it was getting difficult to speak about this growth and $60/ton language." CW7 reported that Cliffs brought in an outside accounting firm during Q2 2012 to run an analysis on whether Cliffs should take an impairment associated with Bloom Lake. It ultimately decided not to take such an impairment during Q3 2012.

> **b. Uncontrolled Labor Headcount And Management Overlap Increase Costs And Inefficiency**

75. Bloom Lake also had a number of undisclosed management and staffing problems, which contributed to its inability to achieve Defendants' stated Phase 1 goals. For example, CW1 stated that Bloom Lake had a problem with management. According to CW1, a major issue was that

---

[5] CW15 was a consultant for CIMA+, an engineering consulting company that handled engineering jobs for Consolidated Thompson, who consulted on Bloom Lake from the fall of 2010 through summer of 2011 as part of a project called "Improvement on the Phase I." CW15 analyzed the pumping system of Phase 1, which pumped processed material (a mixture of water and iron ore) through the concentrator. According to CW15, the pumping system was not well-designed because the pumps at Bloom Lake had to run at maximum capacity in order to meet the targeted production rates. CW15 further stated that Bloom Lake had a lot of structural and piping problems. CW15 learned about these problems from contractors who worked at Bloom Lake.

there were two general managers at the mine, Ken Holsten and Bertrand Lessard, who reported to Blake, and "you can't run a boat with two captains." In addition, CW1 explained that while there were too many managers, there were not enough workers. Moreover, CW1 stated that management was not spending money wisely and was not hiring the right people. Instead, management brought in people who lacked relevant mining experience.

76.     Another problem at Bloom Lake was the cost of contract labor. CW5 -- a Financial Systems Contractor from late 2011 through January 2013, who was based in Cliffs' Cleveland headquarters, but spent about 60% of CW5's tenure in Montreal -- stated that CW5 was aware of problems with tracking contractor costs and contractor progress, including how much was billed and how much was paid. CW5 knew about these issues because CW5 was tasked with setting up a work management system for the mine expansion, and through working on the financial systems, CW5 learned about reporting discrepancies. For example, in some of the reports CW5 saw, the report would say that the project was 30% completed, and the contractors may have billed for 5% or even 40% of the project. As CW5 put it, "you've got a commitment spend and construction progress, and they don't necessarily correlate. *It was loosey-goosey accounting."* (Emphasis added.) The reports that CW5 described were prepared in Montreal and sent to Cliffs' headquarters in Cleveland. CW5 further confirmed that Bloom Lake was not a well-organized construction effort, in part because there were too many decision makers.

77.     CW17 -- a Business Analyst Resource Management at Cliffs from approximately March 2011 until September 2013, whose job responsibilities included reviewing the time schedules of employees and contractors working at Bloom Lake and task completion status for the projects at Bloom Lake that had an IT component -- confirmed that the mine had problems with contract labor. CW17 had access to reports that included details about the Bloom Lake workers, the projects they were hired for, and how long those projects were expected to take. CW17 was aware of certain projects within the Company that ran overtime. Often, CW17 would find that contract workers "came to do this project and it wasn't done." CW17 reported these overages to the management in IT, who, in turn, reported to the CFO of Cliffs (Brlas or Paradie). In addition, when CW17 gave

recommendations, the CIO told CW17 that he, the CIO, was "taking it forward," meaning that the CIO would "be speaking to the relevant Project Managers about employee and contractor allocation." CW29 similarly noted that there was substantial management turnover at Bloom Lake as CW29's bosses and the directors of Bloom Lake were frequently replaced or left because once "they realized [the targets] weren't feasible, they hadn't reached the target so they were out."

**c.**    **Transportation Infrastructure Was Substantially Deficient, Causing Additional Plant Shutdowns And Increased Costs**

78.    Throughout the Class Period, Defendants represented that Bloom Lake's transportation system, including the "rail and port infrastructure," was a source of reduced costs at Bloom Lake and a way to increase production. For example, on July 31, 2012, Blake represented to investors that Bloom Lake's port and rail facilities "are working quite well."

79.    Contrary to these assurances, Bloom Lake was experiencing serious problems with its transportation infrastructure, which contributed to its inability to successfully meet cost and production volume goals for Phase 1. For example, Bloom Lake experienced frequent shutdowns due to loading problems that were caused by the iron ore concentrate (a fine granulated mixture that emerges wet from the concentration process, and is then dried for sale) freezing in the wagons that transferred the concentrate from the treatment plant to the loading area for shipment. When the concentrate becomes frozen, it is virtually impossible to remove it from the wagon trains onto the boats that take it through the port, and on to customers for sale.

80.    CW19 -- a Coordinator of Mechanical Maintenance for Consolidated Thompson, and subsequently Cliffs, from June 2010 through April 2013 -- was charged with ensuring that the unloading of the wagon trains was functioning properly. CW19 stated that the freezing of the material in the wagons was a big problem that occurred every winter. According to CW19, this freezing meant that the concentrate in the wagon trains could not be unloaded and shipped to Cliffs' customers. CW19 stated that this problem slowed down production and shut down the plant at times. The Company did not develop a fix for this issue until the winter of 2012 through 2013, which, CW19 stated, cost a lot of money.

-20-

81.     CW20 -- a Wabush employee during the period of June 2008 through December 2011 who was charged with ensuring maintenance of the plant and railway, and wagon repair -- confirmed that the wagons at Bloom Lake froze every winter between December and February, resulting in plant shutdowns and increased costs.  According to CW20, Bloom Lake -- unlike Wabush -- did not have dryers to dry out iron ore concentrate and prevent it from freezing.  This resulted in a lack of available wagons to transport and load the iron ore concentrate for shipment, increasing loading time from a few hours to two days.  CW20 stated that this problem caused plant shutdowns, which cost several million dollars per day.  CW20 also noted and reported to CW20's boss other transportation and operational issues at Bloom Lake, including problems with the sorting of the iron ore and problems with the conveyers, which transported excavated material to the concentrator.[6]

82.     CW21 -- a wagon maintenance coordinator for the Wabush mine from September 2010 through January 2012 -- confirmed that the iron ore in the wagons at Bloom Lake froze during the trip from the treatment plant to the loading equipment area, which caused Cliffs to incur additional costs.

83.     CW18 -- a Senior Project Manager at Cliffs from approximately March 2011 until September 2013, who personally visited Bloom Lake in October 2011 -- opined that "the rail issues were monumental."  The purpose of CW18's visit was to tour the mine facility to determine where to install payroll software equipment.  During this visit, which lasted for six hours, Bernard Noel, the Director of IT at Bloom Lake, showed CW18 around.  CW18 spent time at the roadhouse and on the rail "talk[ing] [primarily with Noel] about the challenges they'd had and how they'd just reopened sections and there had been delays."  Through these conversations, CW18 learned that in Phase 1, Defendants were "having trouble optimizing [the rail], so it wasn't producing to capacity"; in Phase 2, the rail could not support production; and, in sum, the rail track was "garbage."  CW18 personally

---

[6] CW16 -- Construction Coordinator, Bloom Lake Phase 2, Management Control, from August 2011 until December 2012 -- confirmed that there were millions of dollars' worth of problems with the conveyor, which also resulted in cost overruns at the mine.  CW16 explained that the conveyor did not work well because of dikes that caused the ground to shift, and because the conveyor pulleys were assembled in the wrong place.

saw "quite a stockpile of ore because of the rail."  CW18 understood from the conversations CW18 had during CW18's visit to Bloom Lake that the issues with the rail had caused a "major bottleneck in production."  Based on a six-hour visit to Bloom Lake, these issues were apparent to CW18, as they would have been to anyone else who visited the facility and made even casual inquiries.

### 6. Individual Defendants' Knowledge Of Bloom Lake's Systemic Production Problems

84.     Multiple CWs confirmed that when the Individual Defendants made the statements and omissions of material fact regarding Bloom Lake's Phase 1 discussed above and/or set forth in detail in Appendix A, they knew of, or recklessly disregarded, that the true conditions at the mine made Phase 1's production and cost goals impossible to achieve, and the Phase 2 expansion economically unfeasible.  A summary of the factual allegations evidencing the scienter of each Individual Defendant with respect to Bloom Lake is detailed in § VII, and discussed briefly below.

85.     In addition to the detailed reports concerning costs and operations, described in ¶¶ 65, 67-68, and 72-73 above, Carrabba, Brlas, Paradie, and Blake also learned about the problems at Bloom Lake from their visits to the mine.  For example, CW1 reported that Blake personally visited the mine every two or three months.  CW29 also confirmed that Carrabba, Brlas, Blake, and Paradie visited Bloom Lake about 10-15 times during CW29's tenure (December 2010 until August 2013).  In addition, according to CW2, Brlas made frequent visits to Montreal toward the end of 2012.  CW26 -- the Mine Manager in charge of operations at Bloom Lake from early 2012 through year-end 2012, who reported to Ken Holsten, a GM of Bloom Lake -- confirmed that Carrabba, accompanied by most of Cliffs' vice presidents as well as Brlas, visited Bloom Lake at least twice on two separate occasions during CW26's tenure.  CW16 further confirmed that senior Cleveland-based executives visited Bloom Lake to see Phase 1 in 2012.  According to CW25, Brlas and Carrabba made "consistent" visits to Bloom Lake throughout CW25's tenure (from February 2008 until September 2013); Blake was also at Bloom Lake "quite often."  Indeed, CW25 stated that Bloom Lake was "being inundated with corporate people all the time."

86.     Carrabba, Brlas, Paradie, and Blake also learned about the then-existing problems at

Bloom Lake through the due diligence conducted in connection with Cliffs' acquisition of Consolidated Thompson. CW29 stated that Blake was part of the Bloom Lake due diligence team. Moreover, the two managers of Bloom Lake reported directly to Blake, as confirmed by CW1, CW17, and CW29. CW29 and CW10 confirmed that senior management traveled to the mine to conduct that due diligence, and that the due diligence was run out of Cliffs' Cleveland headquarters. Indeed, Carrabba stated during the Company's January 11, 2012 conference call announcing Cliffs' plan to acquire Consolidated Thompson, *"[W]e've done our due diligence, and we've had a good look at the asset."* (Emphasis added.)

87.     As mentioned above in ¶ 74, by the second quarter of 2012 the problems at Bloom Lake were so severe that, according to CW7, Cliffs had *an impairment analysis run on Bloom Lake.*

**E.     The Fraud In Phase 2:  Defendants Conceal Nonviability Of Expansion**

88.     Despite the fact that Phase 1 was riddled with problems, delays, and cost overruns, Cliffs falsely told investors that Phase 2 was economically feasible and was going to double production volume at Bloom Lake to 16 million tons of ore per year in 2013. The Phase 2 expansion would purportedly create a second production line that was identical to the first, thereby generating additional cash to fund the dividend. In truth, the Phase 2 project itself was beset by cost overruns and delays -- material information that was not disclosed to investors.

**1.     Defendants Falsely Assure Investors That The Bloom Lake Expansion Was "On Track" And "Going Very Well"**

89.     Throughout the Class Period, Defendants repeatedly assured investors that Phase 2 was "on track" and going "well." For example, during the Company's conference call on March 14, 2012, Carrabba heralded Bloom Lake as providing a "pathway to 16 million tons in 2013." In response, analysts credited the Bloom Lake expansion project as the source of the Company's growth. For example, CIBC World Markets reported on March 22, 2012: "We expect Bloom Lake to add 16MM [tons per year] to Cliffs' existing production by 2014."

90.     Defendants continued to assure investors that Phase 2 was on track throughout the Class Period, notwithstanding their partial disclosures of production issues in Phase 1, detailed above

in § V.D.1-4, and their knowledge or reckless indifference to the fact that Phase 2 was over-budget and behind schedule.  For example, on April 26, 2012, Carrabba stated, *"[O]ur expansion to 16 million tons at Bloom Lake is progressing well."*  (Emphasis added.)  Similarly, Blake and Brlas falsely assured investors on July 31, 2012, "[W]e're expecting double production by the end of 2013."  On October 25, 2012, Carrabba falsely stated, "We continue to make progress on the construction of Bloom Lake's second phase . . . .  [W]e are *still on track* to commence production during the first half of next year."  (Emphasis added.)

91.     The market believed Defendants' assurances.  For example, CIBC said on April 26, 2012:  "We believe growth for Cliffs will primarily come from Bloom Lake as ramp-up to 16MM tpa [tons per annum] is underway."  Dahlman Rose & Co. similarly reported on July 31, 2012:  "We believe in the growth story that is set to emerge from Cliffs' Eastern Canada operation."  RBC Capital Markets similarly stated on October 25, 2012 that "Cliffs stated on the call that its priorities are . . . completing Phase II . . . ."

92.     On November 19, 2012, less than a month after Defendants' assurances that the Phase 2 expansion was "on track," the Company issued a press release revealing that it was halting Phase 2.  Further, Defendants announced that "construction related to these activities will cease and third-party contractors will be demobilized immediately."  As a result of the delay of Phase 2 construction, Cliffs decreased its estimated Eastern Canadian iron ore sales volumes for 2013 from 13-14 million tons to 9-10 million tons.

93.     Analysts reacted negatively to this news.  For example, the next day, Goldman Sachs cut its rating on Cliffs' stock from "Neutral" to "Sell," citing Bloom Lake's expansion delay.

94.     Defendants continued, however, to falsely attribute the delay of Phase 2 to "increased iron ore pricing volatility."  In reality, Phase 2 was delayed because of skyrocketing costs resulting from serious undisclosed problems at the mine, not volatility in iron ore prices.  Indeed, Defendants idled the Phase 2 expansion at a time when iron ore prices were rising and were no more volatile than they had been at any other time during the Class Period, as described in § V.G.2 and Appendix C.

### 2. Defendants Knew That The Expansion Was Not Economically Feasible

95. In stark contrast to Defendants' assurances above, numerous CWs confirmed that Defendants knew (or at least recklessly disregarded) that the Phase 2 expansion was economically unfeasible. As detailed in § V.D.6 above and further in § VII below, the Individual Defendants knew from multiple sources that Phase 1 was beset with rampant systemic problems, resulting in production delays and cost overruns. As a result, Phase 1 could not and did not generate sufficient cash to fund the Phase 2 expansion.

96. Moreover, senior executives in Montreal so feared Cliffs' Cleveland headquarters' response to the true expansion budget that they engaged in rampant and obvious accounting machinations in futile attempts to hide the actual costs of Phase 2, as detailed below. Nonetheless, the Individual Defendants and other senior Cliffs executives received regular reports containing the true facts regarding the expansion, which they themselves then hid from the investing public, while repeatedly assuring the market that Phase 2 was progressing "well" and was "on track."

97. The Phase 2 expansion was led by Pascal Vallée ("Vallée"), whose title was Phase 2 Project Manager and who was selected by the former Phase 2 Project Manager, his brother, Hubert Vallée. As described by CW16, Vallée was engaged in rampant accounting manipulations designed to make Phase 2 seem more economically feasible than it was. For example, CW16 would inform Vallée that a particular project was going to cost a certain amount, and Vallée would routinely tell CW16 to reduce the figure, even if the reduced figure was not realistic. Another time, CW16 reported that the budget had included lodging costs for 450 rooms, but that there would need to be 600 workers. At one point, one of Vallée's underlings instructed CW16 to change budget reports to reflect lower man-hours and costs than CW16 estimated. CW16 asked: "Are you asking me to lie?" In response, CW16 was told: "Yes." CW16 further explained that Cliffs' budgets typically left no margin for the kinds of fairly standard obstacles that one encounters when running and expanding a mining operation. This poor planning led to predictable cost overruns.

98. Despite Vallée's efforts, the problems with Bloom Lake's expansion were obvious and known to, or recklessly ignored by, Cliffs' executives in Cleveland. In fact, CW16 stated that

Vallée's accounting manipulations "were obvious" and that anyone with CW16's background "would have seen within five minutes" that the report "[did not] make sense."

99.    Furthermore, according to CW16, Vallée and his team held budget meetings at least once a month during 2012 and 2013, but sometimes as frequently as every three weeks. CW16 could not remember a meeting where they did not increase the budget by $10 million. CW16 stated that the Cleveland headquarters received regular reports from these meetings and, in some instances, sent representatives to attend the meetings in person. CW16 recalled one meeting where a consultant that Cliffs had hired began criticizing the Phase 2 plans, saying that certain things were impossible and could not happen. Vallée arrived late to the meeting due to a scheduling error, and when he arrived, according to CW16, he was not happy and told everyone "to shush." CW16 stated that the meeting was widely attended, and Cleveland received a report of the meeting.

100.    In addition, the Cleveland headquarters received numerous other reports that would have revealed that Vallée was manipulating the costs and budget of Phase 2 during the Class Period. For example, as described in greater detail at ¶¶ 65, 67-68, and 72-73, Carrabba, Brlas, Blake, and Paradie received regular reports from Bloom Lake's Phase 1 production side disclosing that there were significant cost overruns and that Bloom Lake was not generating as much revenue as promised.

101.    Despite receiving reports that undercut Vallée's rosy depiction of finances for Phase 2, and despite the fact that the costs for Phase 2 itself continued to rise dramatically, Cliffs' executives falsely assured investors throughout the Class Period that Phase 2 was "on track." When Defendants were finally forced to delay the Phase 2 expansion project on November 19, 2012, CW16 stated that the true reason was costs, and that market volatility was a fabricated reason for the delay.

**F.    The Fraud Concerning The Dividend: Dividend Never "Stress Tested" Or Sustainable**

102.    Despite the rampant operational problems at Bloom Lake, detailed above in § V.D.5, Defendants continued to tout Bloom Lake as a source of increased cash for investors and represent that the primary reason the Company was able to maintain its massive dividend increase was Bloom

Lake's Phase 1 production ramp up and resulting increase in cash.

103.   Throughout the Class Period, as Phase 1 production costs at Bloom Lake continued to increase instead of decrease, and with Defendants knowing that Cliffs would not be able to achieve its Phase 1 production goal, let alone double production in Phase 2, Defendants also continued to provide false assurances that the dividend was "sustainable" and that they had "stress tested" the dividend to ensure that it could be maintained.  In truth, Defendants lacked the ability to and did not "stress test" the dividend, and the internally well-known, systemic problems at Bloom Lake made it impossible to maintain the increased dividend with an influx of cash from Phase 1.

> 1.   **Defendants Falsely Assure Investors That Dividend Was "Stress Tested" And "Extremely Sustainable"**

104.   During Cliffs' March 14, 2012 conference call, Defendants touted Bloom Lake as the "premium asset" that would maintain the Company's historic 123% dividend increase.  Defendants further assured investors that notwithstanding the Company's transition to the "quite volatile" spot-pricing model of iron ore sales, the dividend was sustainable.  Indeed, Brlas assured investors that "we did [] ***a significant amount of analysis*** . . . to be comfortable that . . . even over a wide variety of iron ore pricing scenarios, we're still comfortable with this dividend level."  (Emphasis added.)

105.   Defendants continued to represent that the dividend was strong and had been "stress tested" throughout the Class Period, even in the face of partial disclosures regarding difficulties with production and costs in Phase 1.  For example, on July 26, 2012 Brlas stated, "As I said a couple of times, ***we really pressure-tested [the dividend] and believe that we can sustain this dividend under quite a few variations of pricing scenarios.***"  (Emphasis added.)  Carrabba echoed Brlas's assurances:  "*[W]e didn't put this dividend on to take it off the table if things got tough.  **We've done it under a lot of different scenarios and we continue to maintain that we can support that dividend***."  (Emphasis added.)

106.   Indeed, during the same July 26, 2012 call, in response to analysts' questions on the impact of declining iron ore prices on the Company's dividend, Carrabba and Brlas again reiterated that they did that "scenario planning" prior to announcing the dividend increase.  Carrabba stated,

*"we do the risk analysis and do the scenario planning."* (Emphasis added.) Brlas emphasized, *"[W]e certainly did that [scenario planning] before we announced the dividend increase."* (Emphasis added.) At the July 31, 2012 analyst conference, Brlas reiterated that Cliffs is "stress testing our [iron ore pricing and dividend] models constantly." Carrabba further stated that "no matter what stress tests you put in pricing right now, we're still in pretty good shape." In addition, Brlas stated: *"[W]e did a great deal of pressure stress testing at iron ore prices certainly below what you're seeing today."* (Emphasis added.)

107. The Company's assurances successfully convinced the market that the dividend was still "safe." Macquarie similarly concluded: "We see dividend as safe, even with our estimate cuts, and [Cliffs] was very forthright in defending the dividend even if the market proves more challenging than they presently envision." Deutsche Bank similarly reported on August 1, 2012: "Cliffs management re-iterated its commitment to sustain a regular annual cash dividend rate of $2.50/share (~6% yield) and have 'stress tested' for various pricing scenarios."

108. During Q3 2012, the price of iron ore reached the lowest levels seen during the Class Period, including several weeks below $100 per ton, before recovering. On October 24, 2012, Cliffs disclosed its results for Q3 2012, including cash costs per ton of $88 at Bloom Lake, a reduction in Phase 1's expected production volume, and a 36% decrease in revenue per ton year-on-year. Despite Bloom Lake's continuing problems, and decreases in iron ore, Carrabba continued to offer strong support for the sustainability of the dividend, stating on October 24, 2012: "During this volatile pricing environment, management remains focused on . . . *maintaining our cash dividend* and investment-grade rating." (Emphasis added.)

109. During Cliffs' October 25, 2012 conference call, Carrabba again acknowledged a "volatile pricing environment," but continued by reiterating that "we remain focused on . . . maintaining our current dividend." Again, the market was convinced by Defendants' false assurances. For example, RBC Capital Markets reported on October 25, 2012: "Cliffs' strategic focus is on Bloom Lake and the dividend. . . . Cliffs stated on the call that its priorities are . . . *preserving the dividend."* (Emphasis added.) Deutsche Bank stated the same day: "Dividend tight,

but doable."

### 2. Defendants Knew That The Dividend Was Never Properly Stress Tested Or Sustainable

110. In reality, contrary to Carrabba's and Brlas's repeated false assurances, Defendants failed to "stress test" the dividend to ensure that it was "sustainable" and knew that Cliffs could not generate sufficient cash to maintain the dividend due to the problems with Phases 1 and 2. The process of "stress testing" involves sophisticated and reliable economic modeling capability to run sensitivity analyses that utilize several inputs, including iron ore prices, production volume, and operating costs. Moreover, "pressure-testing" the Cliffs dividend under various iron ore pricing "scenarios" fundamentally required Cliffs to have access to adequate iron-ore pricing data. Due to Cliffs' company-wide iron ore price modeling inadequacies, those representations were recklessly or knowingly false.

111. Several CWs stated that Cliffs lacked the various options typically employed by corporate treasury departments to measure the impact of and hedge price risk, including risk posed by volatility. Cliffs even lacked, at a corporate level, access to the basic pricing data that would be used to "pressure test" a dividend. Indeed, Cliffs lacked the budgeting expertise and discipline that were required to make the statements concerning the dividend's "sustainability" true. In reality, Cliffs experienced constant operational difficulties in Phase 1 and budget overruns in Phase 2 which were, in turn, hemorrhaging the cash that the Company claimed would maintain the dividend, as described in §§ V.D.5 and V.E.2 above.

112. According to CW24 -- the Risk Manager for Cliffs' Enterprise Risk Management Department from November 2010 through April 2011, who oversaw the due diligence for Bloom Lake, led a team of senior executives, and personally spoke with Treasury, Risk Management, and Accounting employees who were addressing the dividend issue -- Cliffs generally did not have any sort of financial modeling that considered the cost of iron ore. CW24 stated that this lack of analysis was not limited to the Consolidated Thompson acquisition. Specifically, CW24 stated, Cliffs never really modeled the volatility of the iron price or looked at the value at risk (VAR), meaning the

likelihood that iron ore would not meet the projected cost and how to manage that.  In addition, CW24 explained that the Company had no derivative plan in place to hedge the risk in the event that the target cost of iron ore was not met.

113.  CW24 raised concerns regarding the Company's lack of financial analysis of the price of iron ore with Raguz, who, according to Carrabba, was responsible for conducting the "stress tests" of the dividend (*see*, *infra*, ¶ 142(e)(iii) and Appendix A).  In response, CW24 was told that Cliffs in general did not have any sort of modeling of that nature.  CW24 further stated that to CW24's knowledge, Cliffs did not have a quantitative analytics department that looked into sophisticated modeling.  CW24 spearheaded the drafting of a Request for Proposal to purchase an analytical tool that could run historical simulations on internal and external prices in a more granular and sophisticated manner.  At the time CW24 departed from Cliffs in April 2011, Cliffs had not purchased such a tool or put in place any system to monitor historical pricing.

114.  Moreover, in a meeting in the summer of 2012 with Carrabba, Brlas admitted that Cliffs' price forecasting "did not have the rigor behind it we should have," as discussed above in ¶ 38.

115.  CW7, who "was tasked with gathering historical pricing data to set a baseline of iron ore prices" to ensure the Company's compliance with Australian tax regulations, similarly confirmed that Cliffs' "pricing forecasting was awful" and the Company's ***inadequate price modeling was well-known internally***.  For example, when CW7 requested an iron-ore price index in connection with the Australian project, CW7 was told that "[w]e don't have any."  Indeed, CW7 said that pricing was done "on the back of the envelope."  According to CW7, it was "no secret" that Cliffs' "price modeling sucked. . . . [I]t was almost laughable.  It was always just a guess."

116.  Nor was Cliffs capable of properly projecting budgets.  Indeed, according to CW2, the Company had already spent over half of the Bloom Lake budget before realizing that it had not been efficiently spent.  CW2 explained that the problems with the budget were so bad that the Company had to bring in an entirely new project management team in May or June 2012.

117.  CW2 further confirmed that the Company's management was prone to panic, and

seemed to have completely ignored the possibility that economic conditions could change, and that this could affect the Company.  CW2 expected Cliffs to have done some modeling and forecasting on different economic conditions, but instead, management's response was purely reactionary and the Company did not know what to do.  CW2 stated that the Company did not have any plan in place to address the decreasing price of iron ore.

### G.     Defendants Forced To Slash Dividend By 76%

118.     On February 12, 2013, after the close of trading, Cliffs issued a press release announcing its fourth-quarter and full-year 2012 earnings results and disclosed that the Company would slash its quarterly dividend by 76%, to $0.15 per share.  Significantly, ***this announcement came less than one year after Cliffs' 123% dividend increase.***

#### 1.     Defendants Attribute Dividend Decrease To Problems At Bloom Lake

119.     On the next day, February 13, 2013, Carrabba stated on Cliffs' earnings conference call that the Company cut its dividend to maintain its investment grade credit rating, improve future free cash flow, and continue its growth projects.  Carrabba attributed this decrease to the ongoing inability to generate a profit or reduce costs at Bloom Lake, stating:  "Additionally, we recognize that *Bloom Lake is taking longer to ramp up than we originally expected.  This has directly impacted our profitability in the near-term."*  (Emphasis added.)

120.     Carrabba further stated with respect to Bloom Lake's Phase 1 production volume: *"Our full year sales volume results were lower than our previous expectation . . . ."*  (Emphasis added.)  At the same time, Paradie stated, Bloom Lake's cash costs continued to increase:

> During the quarter, Bloom Lake's cash cost increased 16% to $86 per ton, which was higher due to increased fuel, contract labor, and maintenance and supply costs. At year-end, Bloom Lake's cash cost were in the low $70 per ton range, *higher than our year-end targeted run rate of $65 per ton.*  (Emphasis added.)

121.     Paradie also explained that Defendants did not expect those costs to decrease in the short term, stating:

> For the longer term, we continue to target a mid-$60 cash cost range, *however, until both Phases are optimally producing at a targeted 14 million-ton run rate, we are increasing our targeted cash cost for*

> *Phase I to $70 to $75 per ton . . . .*  [T]otal cash costs at Bloom Lake
> are expected to be $85 to $90 per ton for 2013.  (Emphasis added.)

122.    Not only did Phase 1 fail to generate sufficient cash to maintain the dividend and complete the Phase 2 expansion, as Defendants repeatedly promised throughout the Class Period, but Paradie disclosed to investors that the Company needed to expend another $900 million on Phase 2 in order to accomplish the ramp up at all.

### 2.    Defendants Also Falsely Blame Iron Ore Pricing "Volatility"

123.    Even while making disclosures about Bloom Lake's problems, however, Defendants also sought to misleadingly blame iron ore "price volatility" as a reason to cut the dividend.  In reality, price volatility was a red herring intended to lull the market into ignoring the materially misleading statements and omissions the Individual Defendants and Cliffs had previously made concerning the expansion, production, and operational cost problems at Bloom Lake.

124.    As discussed in detail above, Carrabba and Brlas repeatedly and emphatically assured investors that the dividend increase of March 2012, which occurred during a downswing in iron ore prices, had been "pressure tested" across "a variety of iron ore pricing scenarios."  The reduction in the dividend following Q4 2012 revealed that these prior statements had been false and misleading.

125.    When Cliffs announced its decision to cut the dividend in an earnings statement on February 12, 2013, Carrabba and Paradie placed a portion of the blame on iron ore pricing volatility, citing "*the volatile pricing* we experienced in the second half of 2012."  (Emphasis added.)  During an earnings conference call the next day, February 13, 2013, an analyst asked:  "What happened in the last time we got an update from you?"  Paradie responded that the "*volatile pricing environment*" had led to the reallocation of the Company's cash, including the reduction of the dividend. (Emphasis added.)

126.    During the call, an analyst pointed out that Cliffs had "been saying for the past several months that you would sacrifice growth over dividend but now, obviously, looking at growth as the main driver."  Carrabba reiterated:  "A company of our size, a quarter or two of this type of price spiking really upsets the balance sheet and all of the ratings that we need to go with it.  So, yes, it has forced us to change our position on the dividend."

127.    In other words, despite a year of statements regarding "sustainability" and the rigorous "pressure-testing" of the dividend, including Carrabba's dismissive assuances only one quarter earlier, Carrabba, Paradie, and Cliffs now resorted to "price volatility" for cover.  In fact, as detailed in Appendix C, the price of iron ore in the months preceding the February 13, 2013 dividend cut (and throughout the Class Period) was no more "volatile" than at other times during the prior four years, with prices swinging between $100/ton and $180/ton.

128.    Indeed, Cliffs' decision to cut the dividend was not connected to the price of iron ore at all.  When Cliffs increased the dividend in March 2012, the price of iron ore was *rapidly falling* and would continue on an extended downswing for many months while Carrabba and Brlas repeatedly and emphatically offered "sustainability" assurances.  At the end of the Class Period, however, iron ore prices had rebounded strongly and were *higher than when Defendants originally announced the increased dividend on March 13, 2012*.  (*See* Appendix C.)  Ultimately, however, even at this high and rising price (and without discernible "volatility"), the dividend was cut by 76%.

129.    Thus, in their February 13, 2013 statements, the attempt by Carrabba and Paradie to blame price volatility for the dividend reduction confirmed that:  (i) Cliffs' numerous previous statements that they had "pressure tested" the dividend could not have been truthful and (ii) the real reason for the dividend reduction was the financial impact of the previously undisclosed problems with Bloom Lake.

### 3.    The Market Reacts To Cliffs' Revelations

130.    Analysts observed the grave implications for investors resulting from the Company's disclosures.  BB&T Capital Markets noted on February 13, 2013, for example:  "The combination of the 6%+ EPS dilution and $1.90/sh annualized dividend cut [] were tough pills for investors to swallow."  Macquarie (USA) Research also expressed disappointment, noting that "new earnings estimates [for Cliffs] do not reflect an ability to pay it, so we *believe the mistake was made in the earlier move to raise it."*  (Emphasis added.)

131.    Journalists were similarly surprised by the Company's decision.  For example, Cleveland.com reported on February 13, 2013 that Cliffs' 76% dividend decrease was "shocking . . .

. The high payout of Cliffs' shares was short-lived."

132.    Finally, on March 27, 2013, before trading opened, Morgan Stanley and Credit Suisse severely cut their price targets on Cliffs' stock, citing a weak balance sheet, the potential need to sell core assets, structural changes in the Company's business, and increased costs.  Specifically, observing that "[m]anagement have pinned the future of this company upon Bloom Lake," Credit Suisse reported that "this business has never survived a mining cycle with ~ $3bn of net debt and while owning fourth quartile mining assets before."  Credit Suisse further reported that "[o]n an aggregate basis, the company has been moving toward the right hand side of the cost curve."

133.    Morgan Stanley similarly reported:  "More bad news to be priced in: CLF stock has dropped ~44% YTD on deteriorating operational outlook (especially for Bloom Lake) and a surprise dividend cut."  Morgan Stanley further noted high costs at Bloom Lake:  "Cliffs is continuing to work to reduce costs at the company's Bloom Lake project.  However, given the challenges faced to date and the work being done to prepare Phase II, we believe the risk to costs remains to the upside."

## VI.    POST-CLASS PERIOD DEVELOPMENTS

### A.    Individual Defendants Forced To Resign

134.    Shortly after Cliffs' dramatic dividend cut and analysts' downgrade of Cliffs' stock, three of the four Individual Defendants were forced to resign from the Company.

135.    On July 9, 2013, Cliffs announced that Carrabba stepped down as Chairman, but would remain as President and CEO of the Company until his retirement on November 15, 2013. The Company also announced on July 9, 2013 that Brlas would leave her position as Executive Vice President and President of Global Operations effective immediately.  On August 21, 2013, Cliffs announced that Blake would resign effective October 31, 2013.

### B.    Bloom Lake's Phase 2 Expansion Shut Down

136.    On February 11, 2014, Cliffs announced that it had determined to "indefinitely suspend[]" Bloom Lake's Phase 2 expansion project.  Cliffs further announced that "it would idle Phase I if pricing significantly decreased for an extended period of time."  At the time of the announcement, Cliffs expected to produce and sell 5.5-6.5 million tons of iron ore concentrate in

connection with Phase 1, and predicted cash costs per ton of $85-90.  During the Company's February 14, 2014 earnings call, Carrabba's replacement, President and CEO Gary Halverson, admitted that Bloom Lake's production "volumes are still below the original expectations, and cash costs remain unacceptably high."

### C.    Activist Shareholder Casablanca Wins Proxy Fight

137.    In January 2014, hedge fund Casablanca Capital announced that it had taken a 5.2% stake in Cliffs, and urged current shareholders to oust the then-existing Board and replace the Board with Casablanca's nominees in order to effect changes in Cliffs' strategy.  The thrust of Casablanca's pitch to Cliffs' shareholders was the Bloom Lake boondoggle, described by Casablanca as a "money pit" and a "$6.4 billion misadventure."

138.    On August 4, 2014, Cliffs announced in a Form 8-K filing that all six of Casablanca's nominees had been elected to Cliffs' eleven-member Board.  On August 7, 2014, the Company issued a press release announcing that Casablanca candidate Lourenco Goncalves had been appointed by the Board of Directors to serve as Chairman, President, and CEO.  Goncalves previously stated in a press interview with *Reuters* that he would never have purchased Bloom Lake.

### D.    Bloom Lake Now Shuttered And Bankrupt

139.    On November 19, 2014, Goncalves announced that attempts to form joint ventures to fund the expansion of Bloom Lake had failed and the expansion was not viable.  He further admitted that Cliffs had "shifted our focus to executing an exit option for Eastern Canadian operations that minimizes the cash outflows and associated liabilities."  The estimated cost just to *close* Bloom Lake is "in the range of $650 to $700 million in the next five years."

140.    On January 28, 2015, Cliffs announced that it could not find a buyer for Bloom Lake and that the Company was seeking creditor protection for Bloom Lake under Canadian law, stating the "Bloom Lake Group has stopped generating any revenues and is unable to meet its obligations."

141.    On February 3, 2015, Goncalves described in an interview with *The Globe and Mail* the obviously toxic nature of the Bloom Lake asset that Carrabba had acquired, characterizing Bloom Lake as "the cancer that we have to take out . . . .  We were going through chemotherapy [pursuing

exit options for the mine] and that didn't do it.  Now the [cancerous] limb has been cut off [through the Canadian bankruptcy filing] . . . ."

## VII.    SUMMARY OF SCIENTER ALLEGATIONS

142.    The following allegations, viewed collectively, support a strong inference that Cliffs and the Individual Defendants acted with scienter in that they knew or recklessly disregarded at the time of their own statements detailed in Appendix A hereto, that, contrary to those statements, (i) Bloom Lake suffered from numerous, costly, undisclosed *Operational Problems in Phase 1* and *Expansion Problems in Phase 2*; and (ii) due to the Operational and Expansion Problems, the increased dividend was not sustainable, and Cliffs *lacked price modeling* capabilities that effectively accounted for the price of iron ore and *could not adequately test its dividend*.  These facts reflect that the Individual Defendants and Cliffs, knowingly and substantially, or recklessly acquiesced to these false and misleading disclosures, and omissions of material fact, as primary violators under Section 10(b) of the Exchange Act.

   a.    *Carrabba's Scienter With Respect To Bloom Lake:*

   i.    <u>Statements Regarding Personal Knowledge</u>.  Carrabba represented that he was intimately involved in monitoring Bloom Lake's operations and possessed extensive knowledge of that subject.  (¶¶ 33, 45, 51, and 108.)  For example, on the March 14, 2012 conference call, Carrabba stated that Bloom Lake was a "premium asset" with a "low-cost space for a production base," and "established rail and port infrastructure."  On the April 26, 2012 conference call, Carrabba specifically addressed that Bloom Lake's cash cost target of $60 per ton was "achievable."  Similarly, in the October 24, 2012 press release, Carrabba stated, *"management remains focused on executing the Phase II expansion at Bloom Lake . . . ."*  (Emphasis added.)  Moreover, during the July 26, 2012 call, Carrabba provided a detailed overview of the on-site conditions at the mine, including the state of the tailings pond and dock.

   ii.    <u>Visits To The Mine And Due Diligence</u>.  As confirmed by CW25 and CW26, Carrabba made repeated trips to Bloom Lake to tour the facilities, check on the progress of Bloom Lake's expansion and attend meetings regarding production issues.  (¶ 85.)  CW29 and CW10 also confirmed that Cleveland-based senior management traveled to the mine to conduct due diligence prior to Cliffs' acquisition of Consolidated Thompson.  (¶ 86.)  Given the significance of the Consolidated Thompson acquisition, Carrabba would have traveled himself to Bloom Lake to oversee that due diligence and/or would have received reports concerning the diligence.  Indeed, Carrabba stated during the Company's January 11, 2012 conference call announcing the acquisition of Consolidated Thompson, *"[W]e've*

***done our due diligence, and we've had a good look at the asset."*** (Emphasis added.)

iii.  <u>Reports Concerning Costs And Operations</u>.  According to CW25, Carrabba, along with Brlas and Blake, were ultimately responsible for overseeing costs at Bloom Lake.  (¶¶ 67-68.)  According to CW10, individuals from Cliffs' Cleveland headquarters would attend meetings in Montreal, which were held on average two to three times per month, at which production estimates and equipment issues at Bloom Lake were discussed.  (¶ 65.)  As a result of the reporting and meetings, Carrabba received or had access to detailed reports about shutdowns and cost overruns at the mine.  (*See* ¶¶ 72-73, 76.)  Those reports would have revealed that, as CW1 confirmed, by March 2012, it was "mathematically impossible" to achieve Bloom Lake's 2012 volume production goal due to the number of shutdowns that had already occurred that year.  (¶ 64.)  Carrabba also had access to Bloom Lake's mine plan which, according to CW2, made clear that by October or November 2012, it was impossible to meet Bloom Lake's production goals at a cost of $60 per ton.  (¶¶ 67-68.)

iv.  <u>Q2 2012 Impairment Analysis</u>.  CW7 stated that Cliffs brought in an outside accounting firm during the second quarter of 2012 to run an analysis on whether Cliffs should take an impairment associated with Bloom Lake.  (¶ 74.)  Carrabba would have been aware of this analysis in his capacity as CEO.

v.  <u>Repeated Assurances In Response To Analyst Questions</u>.  In response to direct questions from analysts concerning Bloom Lake's ability to achieve its production and cost-reduction goals, Carrabba repeatedly assured investors that Phases 1 and 2 were on track.  For example, during the July 31, 2012 call, in response to a question from an analyst concerning Bloom Lake's ability to achieve $60-per-ton cash costs by the end of 2012, Carrabba dismissed the analyst's concern, stating, "[T]his is what we do."  Such assurances reflect that Carrabba's statements concerning Bloom Lake were either made with knowledge of their falsity or without any reasonable basis for the statements being made.

vi.  <u>Close Proximity Between False Statements And Later Corrective Disclosures</u>.  As late as October 25, 2012, Carrabba falsely assured investors that Phase 2 was "on track," and "management remains focused on executing the Phase II expansion at Bloom Lake."  (¶¶ 108-09.)  Less than one month later, on November 19, 2012, Cliffs announced that it had decided to suspend Phase 2.  (¶ 92.)

vii.  <u>Self-Interested Motivation</u>.  Carrabba was motivated to defend the Bloom Lake acquisition because immediately following the acquisition, the market was concerned that Cliffs had paid too much for the mine (¶¶ 22-26); and Carrabba had staked Cliffs' future, and his own livelihood, on the success of Bloom Lake (¶¶ 30-31.)

viii.  <u>Forced Resignation</u>.  On July 9, 2013, Cliffs announced that Carrabba had stepped down as Chairman, and would retire as President and CEO on November 15, 2013.  Carrabba's forced retirement gives rise to the strong inference that he knew about the

problems at Bloom Lake, which rendered the Three-Phase Plan impossible to achieve.  (¶ 135.)

ix.  <u>Bloom Lake Central to Cliffs' Day-to-Day Operations</u>.  The mining and processing of iron ore at Bloom Lake was central to Cliffs' day-to-day operations.  For example, Carrabba described Bloom Lake on October 25, 2012 as "the future of the Company." Indeed, analysts note that "management have pinned the future of th[e] Company upon Bloom Lake."  (¶ 132.)

**b.  *Brlas' Scienter With Respect To Bloom Lake*:**

i.  <u>Statements Regarding Personal Knowledge</u>.  For example, Brlas stated on March 14, 2012, that she was *"very confident"* with respect to the expansion of Bloom Lake that "the economics would be extraordinarily high and very, very attractive." (Emphasis added.)  Brlas also repeatedly represented that cash costs-per-ton of $60 in Phase 1 were achievable.  (*E.g.*, ¶¶ 51, 53.)

ii.  <u>Visits To The Mine And Due Diligence</u>.  As confirmed by CW25, CW2, CW26, and CW29, Brlas made repeated trips to Bloom Lake to tour the facilities, check on the progress of expansion and attend meetings regarding production issues.  (¶¶ 85-86.)

iii.  <u>Reports Concerning Costs And Operations</u>.  According to CW25, Brlas, like Carrabba and Blake, was ultimately responsible for overseeing costs at Bloom Lake. (¶ 67-68.)  In addition, CW10 reported that individuals from Cliffs' Cleveland headquarters would attend meetings every two to three weeks in Montreal, at which production and estimates for Bloom Lake were discussed.  Based on her position, and the regular meetings in Montreal, Brlas received or had access to detailed reports about cost overruns at the mine and the mine plan for Bloom Lake, described above in ¶¶ 65, 67-68, 72-73, and 76.  Indeed, CW27 described regular revenue reports that were distributed to the CFO, evidencing "that they weren't getting out of the mine what was originally anticipated."  CW29 similarly described monthly reports containing Bloom Lake's production and cost information which were sent to Jason Petrik, who reported to Brlas.  CW17 further confirmed that each individual department had a responsibility to send reports to the CFO for any "deltas," meaning budget discrepancies of $10,000 or more, with an explanation for the delta.  CW17 was aware of certain projects within the Company that ran overtime, and CW17 reported these overages to the management in IT, who, in turn, reported to the CFO. (¶¶ 72-73, 76-77.)

iv.  <u>Q2 2012 Impairment Analysis</u>.  Brlas would have been aware of the impairment analysis described above in ¶ 74 in her capacity as CFO.

v.  <u>Self-Interested Motivation</u>.  Brlas possessed the same motivation to defend the Bloom Lake acquisition described above in ¶¶ 22-26 and 30-31.

vi.  <u>Forced Resignation</u>. Brlas' forced resignation on July 9, 2013 gives rise to the strong inference that she knew about the problems at Bloom Lake.  (¶ 135.)

vii.  <u>Bloom Lake Central to Cliffs' Day-to-Day Operations</u>.  The mining and processing of iron ore at Bloom Lake was central to Cliffs' day-to-day operations.

**c.**  ***Blake's Scienter With Respect To Bloom Lake:***

i.  <u>Statements Regarding Personal Knowledge</u>.  For example, during Cliffs' July 31, 2012 Investor Day, Blake made detailed statements concerning the mine's operations and equipment, including the concentrator and port and rail facilities.  (¶ 54.)  Blake also stated on July 31, 2012 that Phase 2 "construction is going very well."

ii.  <u>Visits To The Mine And Due Diligence</u>.  As confirmed by CW1, Blake personally visited Bloom Lake every two or three months, or as CW25 stated, "quite often."  (¶ 85.)  CW29 confirmed that Blake was part of the Bloom Lake due diligence team.  (¶ 86.)

iii.  <u>Direct Reports</u>.  The two managers of Bloom Lake reported directly to Blake, as confirmed by CW1, CW17, and CW29.  (¶ 86.)

iv.  <u>Reports Reflecting Costs And Operations</u>.  According to CW25, Blake, like Carrabba and Brlas, was ultimately responsible for overseeing costs at Bloom Lake.  (¶¶ 67-68.)  In that capacity, Blake received or had access to detailed reports about cost overruns at the mine and the mine plan, described above in ¶¶ 65, 67-68, 72-73, and 76.

v.  <u>Repeated Assurances In Response To Analyst Questions</u>.  For example, during the July 31, 2012 conference call, in response to a question from an analyst concerning Bloom Lake's ability to achieve a $60-per-ton cash cost by the end of 2012 and specifically asking "could you end up at $80 for some reason . . . ?", Blake dismissed the analyst's concern, stating, *"[N]o, I don't see it going to $85."*  (¶ 53 (Emphasis added).)

vi.  <u>Q2 2012 Impairment Analysis</u>.  Blake would have been aware of the impairment analysis described above in ¶ 74 in his capacity as Cliffs' SVP, Head of North American Iron Ore Operations, and the direct superior of the two general managers of Bloom Lake.

vii.  <u>Self-Interested Motivation</u>.  Blake possessed the same motivation to defend the Bloom Lake acquisition described above in ¶¶ 22-26 and 30-31.

viii.  <u>Forced Resignation</u>.  Blake's forced resignation effective October 31, 2013 gives rise to the strong inference that he knew about the problems at Bloom Lake.  (¶ 135.)

ix.  <u>Bloom Lake Central to Cliffs' Day-to-Day Operations</u>.  The mining and processing of iron ore at Bloom Lake was central to Cliffs' day-to-day operations.

**d.**  ***Paradie's Scienter With Respect To Bloom Lake***:

i.  <u>Visits To The Mine And Due Diligence</u>.  Prior to his appointment as CFO, Paradie

served as the Company's Corporate Controller and CAO from September 2007 until February 2012.  (*See* ¶ 14.)  According to CW10, the due diligence of Bloom Lake was all run out of Cliffs' Cleveland headquarters, as described above in ¶ 18.

ii.  <u>Knowledge Of Accounting For Bloom Lake</u>.  In his capacity as CAO, Paradie had chief responsibility for Cliffs' accounting.  According to CW27, a lot of Bloom Lake's accounting was done in the Cleveland headquarters, where they had centralized accounts payable and accounts receivable for the whole Company.  (¶ 72.)

iii.  <u>Reports Reflecting Costs And Operations</u>.  Paradie succeeded Brlas as CFO on October 1, 2012.  In his capacity as CFO, Paradie was privy to the same financial reporting as Brlas, detailed above in ¶¶ 65, 67-68, 72-73, and 76-77.

iv.  <u>Bloom Lake Central to Cliffs' Day-to-Day Operations</u>.  The mining and processing of iron ore at Bloom Lake was central to Cliffs' day-to-day operations.

e.  ***Carrabba's Scienter With Respect To The Dividend***:

i.  <u>Statements Regarding Personal Knowledge</u>.  Carrabba represented that he was intimately involved in maintaining Cliffs' dividend increase and possessed extensive knowledge of that subject.  (¶¶ 108-09.)  For example, in the Company's October 24, 2012 press release, Carrabba stated, *"[M]anagement remains focused on . . . maintaining our cash dividend . . . ."*  (Emphasis added.)  On the October 25, 2012 earnings call, Carrabba reiterated, *"[W]e remain focused on . . . maintaining our current dividend level."*  (Emphasis added.)

ii.  <u>Meetings Regarding Inadequate Price Modeling</u>.  Carrabba attended a meeting in the summer of 2012 with Brlas and CW7, where Brlas acknowledged that Cliffs' pricing numbers "did not have the rigor behind it we should have."  (¶ 38.)

iii.  <u>Direct Reports</u>.  Raguz and "his team" were responsible for stress-testing the dividend.  Indeed, Carrabba represented that he was personally aware of the dividend testing process, when he falsely stated on July 31, 2012, "Steve Raguz and his team ***are stress testing our [dividend] models constantly . . . ."***  (Emphasis added.)  Raguz reported to Carrabba from October 1, 2012 through the end of the Class Period.  (¶ 31.)

iv.  <u>Repeated Assurances In Response To Analyst Questions</u>.  In response to analyst concerns, Carrabba repeatedly provided assurances that the dividend had been stress-tested and was sustainable.  (¶¶ 105-06.)  For example, on July 26, 2012, in response to an analyst's question concerning how the dividend would be impacted by "various iron ore benchmark pricing scenarios," Carrabba stated, *"[T]here's plenty of room for the dividend . . . .  **We've done it under a lot of different scenarios and we continue to maintain that we can support that dividend."***  (Emphasis added.)

v.  <u>Close Proximity Between False Statements And Later Corrective Disclosures</u>.  As late as October 25, 2012, Carrabba falsely assured investors that "we remain focused on . . . maintaining our current dividend . . . ."  (¶¶ 108-09.)  Less than one month

later, on November 19, 2012, Cliffs announced that it had decided to suspend Phase 2. (¶ 92.) Less than four months later, Cliffs slashed the dividend by 76%. (¶¶ 118-33.)

vi. <u>Knowledge Regarding Bloom Lake's Inability To Generate Sufficient Cash To Fund The Dividend</u>. Defendants depended upon the cash-flow that was supposed to be generated by Phase 1's increased production volume and reduced costs of production, and the timely and in-budget Phase 2 production expansion to maintain the dividend. (*E.g.*, ¶¶ 32-34.) Because Carrabba knew about the true conditions at Bloom Lake, which resulted in increased costs, decreased production, budget overruns and delays, as described above in ¶ 142(a), Carrabba knew that the dividend was not sustainable.

vii. <u>Self-Interested Motivation</u>. Carrabba was motivated to raise the dividend to unsustainable levels to allay investor concerns regarding the price that Cliffs had paid for Bloom Lake, the impact of falling iron ore prices on the Company's finances, and the fact that Cliffs' dividend was historically lower than that of its peers. (¶¶ 22-29.) Moreover, Carrabba had staked Cliffs' future, and his own livelihood, on the success of the Bloom Lake acquisition. (¶¶ 30-31.)

viii. <u>Forced Resignation</u>. Carrabba was forced to resign on July 9, 2013, mere months after Cliffs announced that it had to slash its dividend by 76%. (¶ 135.)

**f.** ***Brlas' Scienter With Respect To The Dividend*:**

i. <u>Statements Regarding Personal Knowledge</u>. Brlas represented that she was intimately involved in analyzing the Company's dividend to ensure that it was sustainable and possessed extensive knowledge of that subject. (¶¶ 104-06.) For example, during the March 14, 2012 call, Brlas stated, ***"[W]e have tested a wide variety of pricing scenarios over the coming years and are comfortable with our ability to sustain the [dividend] . . . ."*** (Emphasis added.) Similarly, on the July 26, 2012 call, Brlas reiterated, "As I said a couple of times, ***we really pressure tested [the dividend]*** and believe that we can sustain this dividend ***under quite a few variations of pricing scenarios***." (Emphasis added.)

ii. <u>Meetings Regarding Inadequate Price Modeling</u>. Brlas attended a meeting in the summer of 2012 with Carrabba and CW7, where Brlas acknowledged that Cliffs pricing numbers "did not have the rigor behind it we should have." (¶ 38.)

iii. <u>Direct Reports</u>. Raguz, who, along with "his team," was responsible for stress-testing the dividend, reported to Brlas from February 2011 until October 2012. (¶ 31.)

iv. <u>Repeated Assurances In Response to Analyst Questions</u>. For example, when asked about a potential downturn in the Chinese steel production market and a reduction in the iron ore price, Brlas stated, ***"[W]e certainly did that [scenario planning] before we announced the dividend increase . . . ."*** (¶ 106 (Emphasis added).)

v. <u>Inadequate Price Modeling Well-Known Internally</u>. As described above in ¶¶ 111-17, the fact that the Company's inadequate price modeling was known throughout the

Company gives rise to a strong inference that Brlas knew that Cliffs' price modeling was inadequate and that, contrary to her statements to investors, Cliffs had not and could not stress-test the dividend or ensure that it was sustainable.

vi. <u>Knowledge Regarding Bloom Lake's Inability To Generate Sufficient Cash To Fund The Dividend</u>. As described above, Cliffs depended upon the cash-flow that was supposed to be generated from Bloom Lake's operation and expansion to fund the dividend. (*E.g.*, ¶¶ 32-34.) Because Brlas knew about the true conditions at Bloom Lake, described above in ¶ 142(b), Brlas knew the dividend was not sustainable.

vii. <u>Self-Interested Motivation</u>. Brlas possessed the same motivation to increase the dividend to unsustainable levels, and then falsely assure investors that the dividend had been tested, described above in ¶¶ 22-31.

viii. <u>Forced Resignation</u>. As noted above in ¶ 135, Brlas was forced to resign on July 9, 2013, mere months after the Company slashed the dividend by 76%.

**g. *Paradie's Scienter With Respect To The Dividend*:**

i. <u>Succession As CFO</u>. Paradie succeeded Brlas as CFO on October 1, 2012. In his capacity as CFO, Paradie was privy to the same information as Brlas concerning the truth about Cliffs' ability to test the dividend, described above in ¶ 142(f).

ii. <u>Knowledge Of Accounting For Dividend</u>. In his capacity as CAO, Paradie had chief responsibility for Cliffs' accounting, and knew or had access to the information reflecting the Company's inability to stress-test or maintain the dividend.

iii. <u>Knowledge Regarding Bloom Lake's Inability To Generate Sufficient Cash To Fund The Dividend</u>. As described above, Cliffs depended upon the cash-flow that was supposed to be generated from Bloom Lake's operation and expansion to fund the dividend. (*E.g.*, ¶¶ 32-34.) Because Paradie knew about the true conditions at Bloom Lake, described above in ¶ 142(d), he knew the dividend was not sustainable.

**h. *Blake's Scienter With Respect To The Dividend*:**

i. <u>Knowledge Regarding Bloom Lake's Inability To Generate Sufficient Cash To Fund The Dividend</u>. As described above, Cliffs depended upon the cash-flow that was supposed to be generated at Bloom Lake's operation and expansion to fund the dividend. (*E.g.*, ¶¶ 32-34.) Because Blake knew about the true conditions at Bloom Lake, described above in ¶ 142(c), he knew the dividend was not sustainable.

## VIII. <u>LOSS CAUSATION</u>

143. As a result of Defendants' misrepresentations and omissions of material facts, the prices of Cliffs' common stock were artificially inflated throughout the Class Period. As such, the Class purchased Cliffs' common stock at artificially inflated prices during the Class Period. But for

Defendants' misrepresentations and omissions, the Class would not have purchased Cliffs' common stock at all or at these artificially inflated prices. The Class suffered economic losses as the price of Cliffs' common stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks that Defendants had failed to disclose, as summarized herein.

144.    On April 25, 2012, after the close of the financial markets, Cliffs released its earnings for Q1 2012 and, on April 26, 2012, it held a conference call to discuss those results. Cash costs per ton at Bloom Lake were $98, which Carrabba acknowledged during the call were "higher than expected." In addition, the Company announced that "[p]roduction volume for the full year is anticipated to be approximately 11.2 million tons," and that "[t]he Company is increasing its Eastern Canadian Iron Ore full-year 2012 cash-cost-per-ton expectation to approximately $80 - $85, from $70 - $75." Defendants' disclosures about decreased production and increased costs at Bloom Lake partially corrected certain of Defendants' prior statements concerning the production costs and volume at Bloom Lake, which caused the price of Cliffs' common stock to drop significantly on April 26, 2012 from $67.11 per share to $63.54 per share, a decline of 5.32%. Although analysts characterized Cliffs' first quarter results as disappointing, they remained optimistic about Cliffs' long-term prospects. The decline in the price of Cliffs' stock would have been far more severe had Defendants revealed the complete material truth regarding their inability to remediate the massive cost overruns and production problems at Bloom Lake, the nonviability of the expansion project, and that the Company was unable to test and maintain its dividend.

145.    On July 25, 2012, after the close of the financial markets, Cliffs reported higher than expected cash costs at Bloom Lake of $91 per ton on 1.4 million tons of iron ore, and reduced the expected annual production of Bloom Lake's Phase 1 facility from 8 million to 7.2 million tons. The Defendants' disclosures on July 25 and 26, 2012 partially corrected certain of Defendants' prior statements concerning the production costs and volume at Bloom Lake, which caused the price of the Company's stock to drop significantly from $41.15 per share on July 25, 2012 to $38.57 per share on July 26, 2012, or 6.27%. But due to the Defendants' public reassuring statements detailed above in § V.D.2. and ¶¶ 105-07, including blaming the increased production costs and decreased volumes at

Bloom Lake on the decision to switch to a higher grade product, assuring investors that cash costs would drop to $60 per ton, and assuring investors that the dividend had been "tested" and was therefore sustainable, the price of Cliffs' common stock remained artificially inflated. Analysts credited Defendants' statements that costs would stabilize at Bloom Lake; that Phase 2 was progressing well and would increase production volume at Bloom Lake; and that Defendants had tested the dividend and that the dividend was sustainable. The decline in the price of Cliffs' stock would have been far more severe had Defendants revealed the complete truth regarding their inability to remediate the massive cost and production problems at the mine, and that the Company was unable to test and maintain its dividend.

146. On October 24, 2012, after the closing of the financial markets, Cliffs disclosed its results for Q3 2012. Bloom Lake's cash cost for the quarter was $88 per ton on production of 1.4 million tons of iron ore. On October 25, 2012, the Company held its earnings conference call for 3Q 2012 during which Carrabba announced that the Company had reduced its expected production volume in its Eastern Canadian business segment from 9.2 million tons to 8.9 million tons. These disclosures partially corrected certain of Defendants' prior statements concerning production costs and volume at Bloom Lake. The revelation of high costs and severe production issues at Bloom Lake caused the price of Cliffs' common stock to decline from $42.69 per share on October 24, 2012 to $38.20 per share on October 25, 2012, or 10.52%. Due to Defendants' public, reassuring but materially false statements detailed above in ¶¶ 50-59, 90-91, and 108-09, including assuring investors that cash costs would drop to $60 per ton, assuring investors that they were "mak[ing] progress" on Phase 2, and assuring investors that they "remain[ed] focused on . . . maintaining" the dividend, the price of Cliffs' common stock remained artificially inflated. The decline in the price of Cliffs' stock would have been far more severe had Defendants revealed the complete truth regarding their inability to remediate the massive cost and production problems at the mine, and that the Company was unable to test and maintain its dividend.

147. On November 19, 2012, the Company revealed significant adjustments to its 2013 operating plan, effectively admitting that the Bloom Lake project was encountering serious problems.

These adjustments included a suspension of key components of the Phase 2 expansion at Bloom Lake, such as delaying the completion of the concentrator and load-out facilities, and halting its exploratory study of Phase 3. As a result of the delay of Bloom Lake's Phase 2 construction, Cliffs decreased its estimated Eastern Canadian iron ore sales volumes for 2013 from 13-14 million tons to 9-10 million tons. Cliffs also further reduced its estimates for the annual production from Bloom Lake's Phase 1 facility from 7.2 million tons to 7.0 million tons. These disclosures partially corrected certain of Defendants' prior statements concerning the viability and timing of the Phase 2 and 3 expansions, and the production costs and volume at Bloom Lake. The next day, Goldman Sachs cut its rating on Cliffs' stock from "Neutral" to "Sell," citing Bloom Lake's expansion delay and high production costs, as well as concerns regarding the Company's ability to continue paying its dividend. On this news, the price of Cliffs' stock dropped from $35.29 per share to $30.48 per share, or 13.63%. However, due to the Defendants' public, false statements detailed above in ¶¶60 and 94, including blaming the decision to delay Phase 2 on pricing volatility rather than on persistent operational difficulties at Bloom Lake, the price of Cliffs' common stock remained artificially inflated. Defendants' November 19, 2012 disclosures failed to reveal the extent of the known operational problems at Bloom Lake or the unsustainability and lack of adequate testing of the dividend, and those misrepresentations and omissions continued to operate in the market.

148. On February 12, 2013, after the close of trading, Cliffs issued its 4Q and full-year fiscal 2012 financial results, disclosing that it would reduce the dividend by 76%. The next day, February 13, 2013, Carrabba stated on Cliffs' earnings conference call that the Company cut its dividend to maintain its investment grade credit rating, improve future free cash flow, and continue its growth projects. Carrabba also attributed this decrease to the ongoing inability to generate a profit or reduce costs at Bloom Lake, stating that Bloom Lake's production volumes were "lower than our previous expectation." Paradie further stated that Bloom Lake's cash-costs had increased to $86 per ton for the quarter, and were in the low $70s at year end. Not only did Phase 1 fail to generate sufficient cash to maintain the dividend and complete the Phase 2 expansion as Defendants repeatedly promised throughout the Class Period, Paradie informed investors that the Company

needed to expend another $900 million on Bloom Lake's Phase 2 expansion in order to accomplish the ramp up at all.  These disclosures partially corrected certain of Defendants' prior statements concerning the production costs and volume at Bloom Lake.  The news of the decreased dividend and the perpetual problems at Bloom Lake caused the price of Cliffs' stock to drop by 20%, or $7.32 per share, from $36.61 per share on February 12, 2013 to $29.29 per share on February 13, 2013.  However, due to the Defendants' public, false statements detailed above in § V.G.2, including partially blaming the decision to cut the dividend on pricing volatility, the price of Cliffs' common stock remained artificially high.

149.    Finally, on March 26, 2013, before trading opened, Credit Suisse and Morgan Stanley both severely cut their price targets on Cliffs' stock, citing a weak balance sheet, the potential need to sell core assets, structural changes in the Company's business, and increased costs.  The information released on March 27, 2013 revealed to the market that the operation and expansion of Bloom Lake were not economically or operationally viable.  On this news, the price of Cliffs' stock declined significantly, from $21.43 per share on March 26, 2013 to $18.46 per share on March 27, 2013, or almost 14%.  Thus, from March 14, 2012, when Cliffs announced the 123% dividend increase, to March 27, 2013, the price of Cliffs' stock plummeted from $69.50 per share to $18.46 per share, a $51.04 per share loss, or a loss of 73.44% of its value.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

150.    Cliffs' "Safe Harbor" warnings accompanying any forward-looking statements pleaded herein were ineffective to shield those statements from liability.  Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Cliffs who knew that the statement was false.

## X.    THE PRESUMPTION OF RELIANCE

151.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:  (i) Cliffs' common stock met the requirements for listing, and was listed and actively

traded on the NYSE, a highly efficient and automated market; (ii) as a regulated issuer, Cliffs filed periodic public reports with the SEC and the NYSE; (iii) Cliffs regularly and publicly communicated with investors via established market communication mechanisms; and (iv) Cliffs was followed by securities analysts at major brokerage firms who issued reports that were distributed to the sales force and customers.  Each of these reports was publicly available and entered the public marketplace.  As a result of the foregoing, the market for Cliffs' stock promptly digested current information regarding Cliffs from all publicly available sources and reflected such information in the price of Cliffs' stock.  Under these circumstances, all purchasers of Cliffs' stock during the Class Period suffered similar injury through their purchase of Cliffs' stock at artificially inflated prices and the presumption of reliance applies.

152.    A Class-wide presumption of reliance is also appropriate under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  This action involves Defendants' failure to disclose material adverse information regarding the cost and production problems at Bloom Lake, as well as the Company's inability to continue paying its dividend – information that Defendants were obligated to disclose; positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Bloom Lake and the sustainability of the Company's dividend as set forth above, that requirement is satisfied here.

## XI.    CLASS ACTION ALLEGATIONS

153.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons who purchased Cliffs' common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Cliffs and their families and affiliates.

154.    The members of the Class are so numerous that joinder of all members is impracticable.  Cliffs has more than 153 million shares of common stock outstanding, owned by thousands of investors.

155.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members include:  (i) Whether Defendants violated the Exchange Act; (ii) Whether Defendants omitted and/or misrepresented material facts; (iii) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iv) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading; (v) Whether the price of Cliffs' common stock was artificially inflated; (vi) Whether Defendants' conduct caused the members of the Class to sustain damages; and (vii) The extent of damage sustained by Class members and the appropriate measure of damages.

156.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

157.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

158.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### *(Against All Defendants)*

159.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding Cliffs' business, operations, and management, including the Company's ability to test and pay its dividend, and the intrinsic value of Cliffs' securities, as alleged herein; (ii) enable Defendants to artificially inflate the price of Cliffs' securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Cliffs' stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct,

Defendants jointly and individually took the actions set forth herein.

160.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Cliffs' stock during the Class Period in an effort to maintain artificially high market prices for that stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

161.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and prospects of Cliffs as specified herein, including Cliffs' ability to test and pay its dividend.

162.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Cliffs' true condition from the investing public and to support the artificially inflated prices of Cliffs' stock.

164.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cliffs' stock.  Lead Plaintiff and the Class would not have purchased Cliffs' stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

165.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's stock during the Class Period as the prior artificial inflation in

the price of Cliffs' stock was removed over time.

166.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### *(Against Individual Defendants)*

167.    By reason of the wrongful conduct described herein, Cliffs committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.    The Individual Defendants acted as controlling persons of Cliffs within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Cliffs, the Individual Defendants had the power and ability to control the actions of Cliffs and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows: (A) Determining that this action is a proper class action under Federal Rule of Civil Procedure 23; (B) Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; (C) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and (D) Awarding such other further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: March 31, 2015

*/s/ Scott D. Simpkins*
John R. Climaco (0011456)
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA**
**TARANTINO & GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile:  (216) 771-1632
jrclim@climacolaw.com
sdsimp@climacolaw.com

*Local Counsel for Lead Plaintiff, the*
*Department of the Treasury of the State of*
*New Jersey and its Division of Investment*

Michael B. Himmel
Michael T.G. Long
Jamie R. Gottlieb
Joseph A. Fischetti
Brandon M. Fierro
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile:  (973) 597-2400
mhimmel@lowenstein.com
mlong@lowenstein.com
jgottlieb@lowenstein.com
jfischetti@lowenstein.com
bfierro@lowenstein.com

Gerald A. Silk
James A. Harrod
Rebecca E. Boon
Catherine McCaw
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
jerry@blbglaw.com
jim.harrod@blbglaw.com
rebecca.boon@blbglaw.com
catherine.mccaw@blbglaw.com

*Counsel for Lead Plaintiff, the Department*
*of the Treasury of the State of New Jersey*
*and its Division of Investment and Lead*
*Counsel for the Class*

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was filed electronically this 31st day of March, 2015.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Scott D. Simpkins*
*Local Counsel for Lead Plaintiff, the Department of the Treasury of the State of New Jersey and its Division of Investment*