**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY AND ITS DIVISION OF INVESTMENT, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CLIFFS NATURAL RESOURCES INC., JOSEPH CARRABBA, LAURIE BRLAS, TERRY PARADIE, and DAVID B. BLAKE,<br><br>Defendants. | Civ. A. No. 14-CV-1031-DAP<br><br>Judge Dan Aaron Polster<br><br>Magistrate Judge Greg White |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
UNDER RULE 12(f) TO STRIKE
CERTAIN ALLEGATIONS FROM THE SECOND AMENDED COMPLAINT**

Dated:  June 11, 2015

John M. Newman, Jr. (0005763)
Geoffrey J. Ritts (0062603)
Adrienne Ferraro Mueller (0076332)
Brett W. Bell (0089168)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: 216.586.3939
Facsimile:  216.579.0212
jmnewman@jonesday.com
gjritts@jonesday.com
afmueller@jonesday.com
bbell@jonesday.com

*Attorneys for Defendants Cliffs Natural Resources Inc., Joseph Carrabba, Laurie Brlas, Terry Paradie, and David B. Blake*

In an opinion issued less than two weeks ago, in a case where one of the co-lead counsel here was also co-lead counsel for the plaintiffs, Judge Engelmayer of the Southern District of New York scrutinized the same "confidential witness" practices employed here and found them miserably wanting.  *In re Millennial Media, Inc. Sec. Lit*., No. 14-7923, 2015 WL 3443918 (S.D.N.Y. May 29, 2015) (Ex. A).  He concluded that those practices:

- "sit[] at best uneasily alongside Federal Rule of Civil Procedure 11," *id.* at *11;

- are "problematic," "whether or not [they] . . . are industry-standard," *id.* at *6;

- "raise serious questions," *id.* at *1;

- "are unsettling," *id.* at *5;

- "create significant potential for inaccuracy," *id.* at *6;

- are "less than optimal as a means of obtaining a reliable account of the witnesses' statements for use in a future filing," *id.* at *6 n.4;

- resulted in "pervasive" deficiencies in a complaint, and "not . . . merely isolated or immaterial differences between a Complaint and the declarations of a recanting witness," *id.* at *10; and

- violated "basic decency" in how counsel treated so-called confidential witnesses, *id.* at *14.

While in *Millennial Media* the "revelation" of abuses relating to confidential witnesses "appears to have led plaintiffs to voluntarily dismiss th[e] lawsuit" (*id.* at *1), the court made clear that, but for the voluntary dismissal, the "recantations would have left a materially thinner Complaint for the Court to review on a motion to dismiss" (*id.* at *10), and would have left plaintiffs' counsel at risk of sanctions.  *Id.* at *11, *14 n.11.

Judge Engelmayer confronted the same circumstances that have come to light here.  In

-1-

*Millennial Media*, as here, the record showed that counsel had failed to confirm with CWs[1] the accuracy of statements publicly attributed to them.  It showed that counsel had failed to notify the CWs that counsel intended to quote them in a complaint.  And it showed a near-total absence of lawyer involvement—as opposed to non-lawyer "investigators"—in communicating with CWs to ensure that the plaintiffs' pleadings were accurate.  *See id.* at *1, 11.

There, as here, plaintiffs' counsel defended their approach as "industry-standard"— "consistent with the practice of other law firms who prosecute securities cases on behalf of shareholders."  *See id.* at *6.  Judge Engelmayer was unimpressed:

> These deficiencies [statements the witnesses denied making, statements made but presented out of context, statements of knowledge or opinion that lacked a factual basis] could have been avoided had counsel sought to confirm with these witnesses the facts and quotations that counsel proposed to attribute to them.  The necessary refinements could have been made to ensure that quotes were used accurately; that information was presented in proper context; and that opinions, assumptions, hearsay, and speculation were not commingled and confused with representations of facts acquired firsthand by a percipient witness.
>
> It is difficult to come up with a good reason why counsel would *not* attempt to confirm with a witness, let alone any of [the] CWs, the accuracy of the statements that counsel intended to attribute to them in a Complaint.  Perhaps counsel feared that, confronted with such statements, the witness might repudiate, or unhelpfully modify or contextualize, the investigator's account of his earlier statements.  Perhaps counsel were pleased with the pungent sound-bites that the investigator reported by [a certain CW] in particular.  Perhaps counsel feared that a follow-up call to [that CW] to confirm his quotes and determine whether there was a factual basis for them might have led [that CW] to back away, resulting in adjustments that might weaken the draft Complaint.  But those are not good reasons to refrain from checking factual accuracy.

*Id.* at *11 (emphasis in original).  The defense of 'business as usual' is no more persuasive here.

The Court should grant the motion to strike.

---

[1]  This memorandum adopts the same conventions and abbreviations used in Defendants' opening memorandum supporting the motion to strike, D.I. 69-1 ("Mem.")

## ARGUMENT

I.      **THE MOTION TO STRIKE IS THE PROPER VEHICLE TO ADDRESS THE CHALLENGED ALLEGATIONS.**

Plaintiff first argues that the motion should be denied because some courts have refused to consider CWs' affidavits or declarations when ruling on a motion to dismiss, *see* Opposition Memorandum ("Opp.") (D.I. 72 at 2-4), emphasizing two readily distinguishable district court decisions.  In *Halford v. AtriCure, Inc.*, No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010), the court declined to consider affidavits from three CWs refuting the allegations attributed to them in the complaint, where the defendant attached them to its reply brief in support of its motion to dismiss and thus the plaintiff had no opportunity to respond.  *See id.* at *3-4.  Much the same was true in *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 740 (E.D. Mich. 2007), where the court discounted, but elected not to ignore, allegations attributed to a CW who had provided a declaration recanting those allegations, because the plaintiffs had "not yet had the opportunity to respond or otherwise challenge the statements."

Here, by contrast, Plaintiff has had ample opportunity to respond:  Defendants submitted the CWs' declarations in connection with a separate motion to strike, to which Plaintiff has responded with a fifteen-page brief and multiple declarations and exhibits.  As important, Plaintiff's counsel had fair warning before filing the SAC that their use of CWs would come under examination:  having already faced a motion to strike in connection with the previous complaint, they were forewarned of the need for scrupulous care.[2]

---

[2] There is no foundation for Plaintiff's charge (*see* Opp. at 3 & n.3) that this motion amounts to or involves discovery, forbidden by the PSLRA stay or otherwise.  *See In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1134 (N.D. Cal. 2002)  What's involved is simple independent fact gathering with the same opportunity available for both sides—and in fact initiated long ago by Plaintiff itself.  *See* Opp. at 6 (indicating Plaintiff's fact inquiry began in March 2013).  That Plaintiff elected not to formalize its work in written, signed, firsthand witness statements was counsel's own choice.  While that choice allows Plaintiff to hide

The rest of Plaintiff's authorities on this issue reflect boilerplate comments about motions to dismiss that have nothing to do with, or precede and thus do not address, the jurisprudence that has emerged to deal with the unique and troubling CW-related practices in securities cases. *Millennial Media* and the "growing body of cases chronicling the repudiation by CWs of statements attributed to them in securities class action complaints" show where the law of CWs is headed.  *See* 2015 WL 3443918, at *12.  That law does not countenance Plaintiff's brush-off.[3]

Plaintiff goes on to argue that the Challenged Allegations are neither scandalous nor impertinent under Rule 12(f), because an allegation is "scandalous" only if it "unnecessarily reflects on the moral character of an individual" or uses "repulsive language that detracts from the dignity of the court," and that "impertinence" attaches only to an allegation that "bears no relationship to the claims asserted."  *See* Opp. at 5-6 (citations omitted).  Plaintiff ignores the authority in Defendants' opening memorandum that "[a]n unsupported allegation that a business entity engaged in fraud or other improper conduct is scandalous under Rule 12(f)."  Mem. at 8. Allegations of fraud are highly detrimental to reputations.  *Cf. SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 358 (6th Cir. 2014) ("The purposes of Rule 9(b) [are] . . . to protect defendants' reputations against fraud allegations"); *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 847 (6th Cir. 2007) ("'public charges of fraud can do great harm to the reputation of a business firm or other enterprise'") (citation omitted).  Plaintiff also ignores the

---

behind work product protection to avoid putting out the only substantive documentation it has (*see* Opp. at 6 n.7), it also means it can proffer only a limited, second- or thirdhand foundation for defending its position.

[3] It is not remotely accurate to think of this motion as calling for traditional credibility determinations or involving an issue of sequential consistency/inconsistency with a witness simply changing a story, *i.e.*, saying one thing the first time and something different (with no contextual difference) the second time.  The CW's declarations are unified, firsthand, verbatim statements by the declarants, whereas the contents of the SAC are non-verbatim, non-unified, pieces and parts extracted from third-party notes of interviews not otherwise recorded.  Moreover, the practicalities of securities litigation are such as to make it extremely unlikely that any jury will ever be asked down the line to consider the propriety of the SAC's attributions to these CWs as against the contents of the CW's declarations.  Right now is almost certainly the only time that determination will make any difference, or the issue will even be presented.

authority in the opening memorandum holding that allegations that lack "indicia of reliability" are immaterial and impertinent and should not be considered.  Mem. at 6-7.  Here, the Challenged Allegations have been discredited by the CWs in declarations that Plaintiff in many respects does not even contest.

## II.    LEAD PLAINTIFF'S INADEQUATE CW PROTOCOL CANNOT SAVE THE CHALLENGED ALLEGATIONS.

The Opposition scrambles to shed a good light on counsel's handling of the CW process. *See* Opp. at 6-8.  But what this self-congratulatory description of inward-focused, circular procedures highlights are elements that process apparently does NOT include, and for the absence of which there is no valid excuse:

- Attorneys do not routinely become involved in contacts with the CW, even when a decision has been made to attribute a statement in a pleading to a particular CW.

- CWs are not advised to confine their comments to actual, personal knowledge, or to distinguish clearly between personal knowledge versus second-hand commentary, speculation, rumor, chitchat, and the like.

- CWs are not advised that information may be attributed to them in a pleading.

- CW interviews are not recorded verbatim, there are usually no witnesses to the "investigator's" interviews, and CWs are not asked to sign written statements.

- CWs are not provided a copy of the material drafted by counsel for attribution to them in a pleading, and asked to verify or comment on it.

- There is no process for removing CW material and attributions from pleadings when a CW learns about and objects to their use.

To the question "why not," which we asked in our opening memorandum (Mem. at 5), Plaintiff's counsel can say no more than, in substance:  This is what we always do, and it is good enough.  Opp. at 7-8.  But upon careful analysis of the exact same practices, Judge Engelmayer rejected them as "sit[ting] at best uneasily alongside Federal Rule of Civil Procedure 11," "whether or not the practices used in this case are industry-standard."  *Millennial Media,* 2015

WL 3443918, at *11, 6.[4]

"Particularly where a Complaint proposes to rely on quotes drawn from an investigator's memo recounting an unrecorded witness interview"—as occurred here—"it is reasonable to expect counsel, before filing the Complaint, to attempt to confirm with the witness the statements that counsel proposes to attribute to him and to assure that the Complaint is presenting these statements in fair context." *Id.* at *11. Plaintiff's declarations make clear that no such attempt occurred here, even <u>after</u> the CWs submitted declarations with the first motion to strike informing Plaintiff's counsel of the errors in their pleadings (if they did not already know) and even <u>after</u> the Court directed counsel to take special pains to ensure the integrity of their allegations. Having deliberately chosen, at every juncture, not to undertake this "intuitively obvious" "rudimentary fact-checking," Plaintiff is in no position to ask the Court to give it a free pass for presenting false and misleading allegations in the SAC. *Id.* at *12.

## III. THE CW DECLARATIONS REFUTE THE FACTS AND INFERENCES SET FORTH IN THE CHALLENGED ALLEGATIONS.

Plaintiff proceeds to defend the misinformation in the SAC as a matter of substance, arguing that the CWs' declarations do not "meaningfully contradict" the Challenged Allegations, and that, instead of focusing on facts, the declarations are directed at potential inferences from

---

[4] Plaintiff does not even acknowledge *Millennial Media*, despite the involvement there of one of co-lead counsel here, the freshness of that case, and its bulls-eye relevance. The opposition does offer various insignificant distinctions from other cases in which courts rejected reliance on CW-sourced data, and goes on to cite Judge Posner (who was critical of the misuse of confidential witnesses in the important case of *City of Livonia Emps. Ret. Sys. v. Boeing*, 711 F.3d 754, 759 (7th Cir. 2013)), as having commented favorably on a role for confidential witnesses in a case five years ago. Opp. at 5 n.5.

The opposition misses the point. No one is suggesting that it is always and irredeemably wrong to use confidential witnesses as a source of information. It is wrong to use them, though, where "counsel's practices with regard to preparing the Complaint create significant potential for inaccuracy." *Millennial Media,* 2015 WL 3443918, at *6. It is wrong to use them where "plaintiffs' counsel did not attempt to confirm with [the] CWs the quotes attributed to them." *Id.* And it is wrong to use them when "[t]he CWs were not given an opportunity to verify, or refute, that these quotes were accurate or presented in fair context." *Id.* Indeed, that much should be "intuitively obvious." *Id.* at *12.

the facts. *See* Opp. at 1, 2. But that is a gross mischaracterization: on its face, the SAC presents the challenged material not as mere inference, but as statements of fact from the mouths of the CWs. Each CW expressly declares that Plaintiff misstated or distorted what he or she told the investigator. *See, e.g.,* CW 7 First Decl. ¶ 3; CW 18 First Decl. ¶¶ 3, 18; CW 2 Decl. ¶ 3; CW 29 Decl. ¶ 3. Plaintiff's opposition makes clear that its counsel, just as in *Millennial Media*, failed to undertake reasonable inquiry to ensure that the SAC accurately reported what the CWs said.[5]

### A.  Allegations Predicated on CW 7.

The first round of briefing regarding CW 7 saw a pitched battle over the FAC's attributions to her. Salvaging CW 7 is obviously critical to Plaintiff, since stress-testing of the dividend and related iron-ore price modeling are the warp and woof of Plaintiff's dividend-related charges, and the SAC relies almost entirely on CW 7 to justify its allegations of wrongdoing. Plaintiff now says the revised allegations in the SAC "conform . . . to the facts" in CW 7's first two declarations; the additional declaration submitted in connection with the SAC does not change things; and anything more is mere "inference." *See* Opp. at 8-10.

This bob-and-weave characterization is simply not what the SAC says (or what Plaintiff intends the reader to think it says).

- The SAC asserts, and attributes to CW 7, that defendant Brlas said in a mid-2012 meeting that Cliffs' historic pricing numbers were not sufficiently "rigor[ous]." SAC ¶ 38. Nothing in the SAC's report of that supposed conversation limits it to CW 7's 10-year backward-looking Australian tax work. But in her declarations the first time around, and now reaffirmed, CW 7 made clear that her sole conversation with Ms. Brlas on price modeling dealt only with the Australian tax

---

[5] Plaintiff's assertion that the declarations involve a quest to create inferences favorable to the defense is wrong. Opp. at 10. The whole thrust of the motion is that the Challenged Allegations must be removed, and thus cannot provide a basis for any inference, for either side. The only authorities proffered by Plaintiff on this argument (*see id.* at 10 n.14), arise in quite different circumstances unrelated to, and having no bearing on, use of firsthand statements to secure an order excising from a pleading secondhand attributions to those same declarants.

situation.  CW 7 First Decl. ¶¶ 18, 22.[6]  There is no "conformance" here.

- Later, the SAC doubles down on the supposed "rigor" statement with a free-standing general assertion that "Brlas admitted that Cliffs' price forecasting 'did not have the rigor behind it we should have,'" and refers back to the earlier allegation.  SAC ¶ 114.  The non-conformance is even clearer here.  Nor is this a request for the reader to "infer" something about today in the U.S. and Canada from something yesteryear in Australia.  It is putting specific words in a specific CW's mouth in the face of that CW having said Plaintiff got it wrong.

- In the very next paragraph, the SAC, obviously referring back to the supposed Brlas comment about "rigor," says CW 7 "<u>similarly</u> confirmed" that Cliffs' "'pricing forecasting was awful' and the Company's **inadequate price modeling was well-known internally**."  SAC ¶ 115 (underscore added; bold in original).  The SAC goes on to quote CW 7 as saying pricing was done on the back of an envelope, and there was "no secret" the Company's price modeling "sucked," was "almost laughable," and was "always just a guess."  *Id.*  Any suggestion that these attributions can be read as "conforming" to CW 7's declarations is itself "laughable," as is any suggestion that they amount to requests for the reader of the SAC to draw mere "inferences."

- Trapped in its own revisionism, Plaintiff says the SAC "expressly acknowledge[s]" that CW 7's criticisms of Cliffs' price modeling and forecasting were "based on" her Australian experience (Opp. at 9), as if CW 7 herself had offered broad criticisms of the modeling via extrapolation from the Australian work.  But the SAC does not convey that the attributions to CW 7 are mere extrapolations, and in any event CW 7 makes clear she was offering no extrapolation:  she did not "criticize" the dividend or Bloom Lake modeling, about which she had no knowledge.[7]  CW 7 First Decl. at ¶¶ 3, 12, 13, 15, 17, 19.

Plaintiff is in a squeeze.  It needs someone to support the allegations that there was no (or no meaningful) stress testing or price modeling in support of the dividend increase, lest its dividend allegations evaporate.[8]  Without any person or data to give that support, it has cast its

---

[6] At times, Plaintiff seems to suggest that for CW 7 (and also CW 18), only the additional declaration signed following the SAC is intended, or proper, for consideration on this motion.  *See e.g.*, Opp. at 8, 11.  But, of course, the earlier declarations for these individuals (i) addressed matters that appear again in the SAC, (ii) are reaffirmed in the latest declarations, and (iii) are resubmitted with the current motion.  Nothing more is necessary to make them fully applicable here.

[7] Of the same piece is Plaintiff's flatly false assertion that CW 7 "did limited work on price forecasting for the dividend."  Opp. at 10; *see id.* at 9 n.13.  CW 7 was pellucid on this point:  she supplied certain cash tax data, but had no participation in or knowledge of the actual forecasting process at all.  CW 7 First Decl. ¶¶ 3, 13, 15, 17.

[8] There is also the separate item of a mid-2012 impairment analysis, which Plaintiff mishandles.  Opp. at 9.  No one disputes that an analysis was done or that (importantly) the analysis showed no impairment needed to

lot with CW 7, who says she knew about backward-looking tax analysis in Australia, but nothing about the testing or modeling process on the dividend. To make that work, the SAC takes comments limited to the Australia experience and deceptively presents them as if they described the dividend process, or (now, after Plaintiff has been caught) as if they should be seen as relating only to Australia after all but suggesting something "systemic," when no such thing was ever said or suggested by CW 7 or anyone else. No amount of back-end reinterpretation can justify allowing the challenged allegations as to CW 7 to remain in the SAC.[9]

**B.** **Allegations Predicated on CW 18.**

CW 18 was an information technology employee who visited Bloom Lake exactly once, as part of a company-wide project that involved deciding where to place employee punch clocks. CW 18 First Decl. ¶¶ 12, 13. He lacked any experience or expertise in rail infrastructure, operations, or mine production. *Id.* ¶ 29.

Plaintiff defends use of the rail/operations attributions to CW 18 despite CW 18's statements (which Plaintiff does not contest, but also does not reveal in the SAC) that he had no knowledge of or ability to assess "rail infrastructure or operations" and did not purport to do so; that his discussion with another IT person, Bernard Noel, who likewise had no applicable operational experience, were "in passing" and "simple small talk," and consisted of "rumor and speculation." *See id.* ¶¶ 23, 28, 29.

- The SAC begins its reference to CW 18 by attributing to him the unqualified

---

be recognized. The element of the allegation challenged in this motion is its use of CW 7 as opining on supposed "severity" of "problems" in relation to the impairment analysis, an opinion and linkage to which she expressly objects. Mem. at 10 n.12. The opposition does not address that objection.

[9] Plaintiff notes that it has taken portions of its allegations from CW 7's (and also CW 18's) previous declarations, and that defendants do not seek to strike all attributions to the four CWs. Opp. at 8 n.10, 15. But it is only the challenged material that is at issue here. That there are some leftovers hardly validates the use of otherwise improper material, including the leveling of false allegations as a result of "failing to undertake rudimentary fact-checking with a witness." *Millennial Media*, 2015 WL 3443918, at *12.

opinion that "the rail issues were monumental" (SAC ¶ 83), strongly implying that he had a foundation in personal knowledge and expertise to make that assessment – since without that knowledge and expertise, the opinion (whether or not actually held or actually expressed) would be of little or no use.  But, as set out above, the declarations (uncontested on these points) make clear that he had no such knowledge or expertise, thus eliminating any basis for crediting the opinion, even if expressed.

- In the face of CW 18's declaration, Plaintiff now admits that the allegation that "these [rail] issues" would have been "apparent" to any other Bloom Lake visitor (SAC ¶ 83) is not something CW 18 said.  Instead, it is just a freestanding assertion by whoever wrote the complaint.  Opp. at 11.  But that is not how it looks (or, we suggest, was meant to look) to the reader of the SAC.  Unless that paragraph is read as a statement of CW 18's view, there is nothing to justify a conclusion that any visitor would know that "'rail issues were monumental,'" there was "'trouble optimizing'" the rail, the rail track was "'garbage,'" the rail was a source of a production "'bottleneck,'" and so forth.  SAC ¶ 83.

The attributions to CW 18 are weak even on their face.  But in the absence of fair recitation in the pleading of information and context as provided in CW 18's declarations, the attributions give an entirely misleading picture.[10]

## C.    Allegations Predicated on CW 2.

CW 2 is a geologist whose job involved overseeing mineral exploration activities and had nothing to do with operations.  Nevertheless, Plaintiff defends the attribution to him of numerous operations-centric matters at the core of the SAC.  That defense itself is misleading, actually mirroring the kind of misdirection that permeates the SAC itself.

- Plaintiff says CW 2's "role was *inter alia* 'to oversee mineral exploration activities . . . at Bloom Lake'" (Opp. at 12), as if he may have had some additional role at Bloom Lake that could have qualified him to comment on production issues.  But the full sentence in CW 2's declaration shows that the other portion of his assignment was mineral exploration at a different facility many miles away.  CW 2 Decl. ¶ 8.

---

[10] Plaintiff remains mum on why, in the first instance, it chose to rest on hearsay reports from a one-time, pre-class period visitor such as CW 18, rather than his supposed source, Bernard Noel, who worked at Bloom Lake and whose existence, role, and contact information are obviously known to Plaintiff.  *See* Mem. at 5 n.8.  Not only that, but to the extent the attributions to CW 18 actually do trace back to Mr. Noel, their use in the SAC violates the Court's March 5, 2015 order that the statements drawn from confidential witnesses be limited to their "firsthand knowledge."  D.I. 52, at 7.

- Plaintiff says CW 2 admits attending "meetings . . . about Bloom Lake . . . involving 'problems'" (Opp. at 13), as if this supported the SAC's allegation that CW 2 had first-hand knowledge of failures to meet production volume or cost targets.  But the declaration shows that the "problems" on which he had meetings dealt not with operations but exclusively with exploration matters, which play no role of any kind in the SAC.  CW 2 Decl. ¶ 9.

- Plaintiff says CW 2 "admits knowledge of 'budget issues at Bloom Lake'" (Opp. at 12), as if this were firsthand factual data applicable generally to Bloom Lake activities, thus feeding into Plaintiff's theory that the Bloom Lake situation overall was beyond budget and doomed.  But the declaration shows that he had no firsthand knowledge, only a "second hand" belief/understanding; that his belief/understanding related not to operations but to the Phase II capital project; and, importantly, that his belief/understanding was that the project was back on budget by the latter part of 2012.  CW 2 Decl. ¶ 10.

- In a frankly confusing passage, Plaintiff says CW 2 "does not actually deny" telling the investigator that the "'goal of reducing costs [to] $60 per ton was impossible,'" but instead just says he had no "basis" for such a conclusion and so could not "confirm."  Opp. at 13-14.  However, in addition to the "no basis" and "could not" statements, CW 2 explicitly denies having told this to anyone:  "I . . . neither could have, nor did, confirm to anyone [the impossibility of reaching the cost reduction goal]."  CW 2 Decl. ¶ 9 (underscore added).[11]

- Plaintiff defends attribution to CW 2 of the supposed statement that "management was prone to panic," on the basis that he had some (non-specific) interactions with Individual Defendants and that the dividend was at one point increased and then later decreased.  Opp. at 14.  But none of this makes the attribution to him in the SAC consistent with CW 2's denial in his declaration that he ever said it or believed it.  CW 2 Decl. ¶ 11.  It's one thing for Plaintiff to ask the Court to draw an inference that Cliffs "panicked"—for whatever it's worth and assuming it were based on well-pled facts; but quite another to contend that that explicit statement should be put in the mouth of a CW who did not make it.

- Plaintiff argues that just because CW 2 had no responsibility for or involvement in operations and no capability to evaluate costs, efficiencies or any other aspect of operations at Bloom Lake, that does not necessarily mean he had no information on these topics.  Opp. at 13.  Perhaps not, but proper recognition in the SAC of those disabling circumstances, rather than hiding them as Plaintiff does, is essential to any fair assessment of whether and to what extent the attributions to CW 2 should be credited or discounted, and whether any follow-on inferences could (or could not) in turn be drawn.

---

[11] Plaintiff points to the statement in CW 2's declaration that he heard a member of local management in Montreal mention that there were difficulties in bringing Bloom Lake's costs down.  Opp. at 12-13.  But that did not occur until November 2012, very late in the process, at the same time Cliffs itself was publicly announcing its changed plans.  CW 2 Decl. ¶ 9; SAC ¶ 147.  And in any event that item, even in its vague, secondhand form, does not appear in the SAC.

- Plaintiff points out that CW 2 says he knows Joseph Kraft, a mining engineer involved with the mine plan for Bloom Lake.  Opp. at 12.  True, but the SAC attributes to CW 2 (or at least wants the reader to attribute to CW 2) knowledge that Mr. Kraft and his colleagues could not determine a way to get per-ton costs to $60, given "operating costs" and "inefficiencies"; that this was reflected in the mine plan; and that it was put in an "economic model" for higher-ups.  SAC ¶¶ 67-68.  CW 2's declaration flatly denies this knowledge (CW 2 Decl. ¶ 9), and Plaintiff offers no response.[12]

Again, it is clear that if the proposed attributions to CW 2 in the SAC had been put in front of him for verification at all, let alone in the full context of the pleading, he would never have authorized inclusion of the allegations challenged as to him, at least not without qualifications that would have radically altered their content and meaning.

### D.  Allegations Predicated on CW 29.

CW 29 was a low-level financial analyst with no engineering or operations training or experience, who met but had no substantive business interaction with any of the Individual Defendants.  CW 29 Decl. ¶ 9.  Plaintiff defends the SAC's use of CW 29, asserting that his declaration "accords" with attributions to him (Opp. at 14), even though his declaration flatly rejects one of the key attributions, and makes clear that numerous others are of the "exaggerated," "chatting," "shooting the s_ _ _," "beer[s] talking" character that Judge Engelmayer found to undermine the integrity of the complaint in *Millennial Media*, 2015 WL 3443918, at *7-10.

- As part of its "accord" argument, Plaintiff says CW 29 does not dispute that he "made the statements attributed to him in the SAC."  Opp. at 14.  But probably the most significant attribution is CW 29's supposed "confirm[ation]" that from "at least September 2011," it was "clear" Bloom Lake could not ever achieve its 8.0 million ton annual production goal, that the facility was "never designed for" that quantity, and that to say otherwise "was misleading."  SAC ¶ 66.  By contrast, CW 29's declaration states unequivocally that he had no ability to assess

---

[12] Here again, as with CW 18 and Mr. Noel, Plaintiff does not explain why it is using CW 2 as a second-hand reporter of what Mr. Kraft may have thought or said rather than Mr. Kraft himself (*see* Mem. at 4 n.7)—which is again out of line with the Court's order requiring "firsthand knowledge."  D.I. 52, at 7.

these matters and did not "confirm" anything of the sort to the investigator.  CW 29 Decl. ¶ 10.  How Plaintiff can say the declaration "accords" with the SAC on this key issue is beyond comprehension.

- Plaintiff defends the references to "laugh[ing]" and "internal joke" as acceptable for attribution for supposedly being honestly held thoughts and opinions, including in the form of relaying "opinions of [unspecified] others whom he observed."  Opp. at 15.  But that is a far cry from what the SAC itself would have the Court understand, which is that CW 29 had both meaningful personal knowledge of the Company's operational plans and also the capability to evaluate the likelihood of success of those plans.  CW 29's declaration explicitly denies any such personal factual knowledge or capability.  CW 29 Decl. ¶ 11.  Notably, Plaintiff does not now contend otherwise.[13]

CW 29 does not now stand, and has never stood, behind anything he actually did say as being a foundation for an assertion of fraud by Cliffs, which he does not believe.  CW 29 Decl. ¶ 7.  As he separately advised the investigator, his comments were not a "statement of facts," and not for use in court.  CW 29 Decl. ¶ 11.  Plaintiff has done nothing to acknowledge, let alone respect, CW 29's own views.  And of course, as with CWs 7, 18, and 2, it is evident that had CW 29 been given the opportunity to verify the factual and contextual accuracy of the attributions, with the knowledge of their use, Plaintiff would have been left high and dry.  So much for the "fairness" and "basic decency" that Judge Engelmayer held out as the minimum standard for treatment of confidential witnesses.  *Millennial Media,* 2015 WL 3443918, at *12-14.

## IV.  PLAINTIFF'S MISCELLANEOUS ADDITIONAL ARGUMENTS ADD NOTHING TO ITS POSITION.

Remarkably, Plaintiff maintains that the Court should overlook the demonstrably false allegations about CWs 2, 7, 18, and 29 because there are other allegations in the 50-page, 168-paragraph SAC that are not targeted by the motion to strike.  Opp. at 7, 12, 15.  By that inverted

---

[13] For yet a third time, these CW attributions ignore the Court's order to stick with "firsthand knowledge."  For CW 29—as to whom not just the use in the SAC, but also the actual contact from the "investigator" occurred after the Court had given its directive—the transgression is particularly egregious for passing on "laughing," "joking," and other purported "opinions" of third parties who are not even identified.

logic, dishonest allegations must be condoned as long as they do not predominate in a pleading.

That attitude finds no basis in the Civil Rules:  Rule 12(f) does not permit a soupçon of

impertinent or scandalous matter; it authorizes a court to strike "any" such matter.  Likewise,

Rule 11 flatly prohibits allegations not supported by reasonable inquiry into their truthfulness.

Whether a plaintiff can get away with a fast-and-loose approach to CWs should not depend on

whether a defendant undertakes to track down and get a corrective declaration from each and

every one.  Indeed, in *Millennial Media*, the defendants delivered information on only 3 of the

several confidential witnesses (2015 WL 3443918, at *2), but that, together with one other such

witness whose objections came out separately, was enough for Judge Engelmayer to act to

protect the court's processes (*id.* at *2-3) and, eventually, for plaintiffs to withdraw their

complaint.  Whether Defendants here could identify and track down (or even sought to) all the

CWs—no matter how insignificant they were to the pleading—should have no bearing on

whether Plaintiff should be permitted to make misleading allegations about any of them,

especially where counsel by their own account applied the same faulty methods to all.

In the same vein, Plaintiff intimates that even if the SAC does not faithfully reflect what

the four challenged CWs actually said, it does not matter and the material should remain,

because the gist of what is attributed to them appears elsewhere in the SAC also.  *E.g.*, Opp. at

10, 12, 15 (arguing that the Challenged Allegations are "amply corroborated by other CWs").

We respectfully suggest precisely the opposite conclusion:  the fact that multiple parts of the

SAC are in tune with the Challenged Allegations should lead any prudent reader to cast a

jaundiced eye over the entire pleading.[14]   *"[F]alsus in uno, falsus in omnibus."  The Santissima*

---

[14] Besides, even on their face, the supposed "corroborating" CWs are at best limp and unworthy for the role.
None is cited at all for CW 7.  For CW 18, two of the proposed surrogates worked at a different mine
(Wabush) and left employment before the class period; none of them ever said an issue, once recognized, was

-14-

*Trinidad*, 20 U.S. 283, 339 (1822) (Story, J.) ("What ground of judicial belief can there be left, when the party has shown such gross insensibility to the difference between right and wrong, between truth and falsehood?").

## CONCLUSION

The opposition does nothing to save the challenged CW attributions. If anything, it helps show why they should be stricken. Upon thoughtful consideration of the analysis and conclusions found in *Millennial Media*, we believe the Court will readily conclude to grant the motion to strike, and we urge it to do so.

Dated: June 11, 2015

Respectfully submitted,

/s/ John M. Newman, Jr.
John M. Newman, Jr. (0005763)
Geoffrey J. Ritts (0062603)
Adrienne Ferraro Mueller (0076332)
Brett W. Bell (0089168)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: 216.586.3939
Facsimile: 216.579.0212
jmnewman@jonesday.com
gjritts@jonesday.com
afmueller@jonesday.com
bbell@jonesday.com

*Attorneys for Defendants Cliffs Natural Resources Inc., Joseph Carrabba, Laurie Brlas, Terry Paradie, and David B. Blake*

---

not taken into account in ongoing planning; one noted the situation for which he is cited was eventually solved; and none of them ever suggested whether, when, or how the items of purported information reached any of the Individual Defendants. SAC ¶¶ 80, 81 & n.6, 82. As to CWs 2 and 29, the "others" to whom snippets are attributed are a mishmash of sources, sometimes anachronistic and/or secondhand, who have opinions and find fault on scattered subjects (*e.g.,* "too many managers . . . not enough workers" (SAC ¶ 75), concentrator "wear and tear" (SAC ¶ 71), production *volume* for a particular early year (SAC ¶ 64) as opposed to eventual full production *rate* goal), but nothing more. None of the supposed "corroborators" is alleged ever to have communicated with any Individual Defendant.

-15-

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 11, 2015, copies of the foregoing Reply Memorandum in Support of Defendants' Motion Under Rule 12(f) to Strike Certain Allegations from the Second Amended Complaint was filed electronically with the Court.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

                                                    /s/  John M. Newman, Jr.
                                                  John M. Newman, Jr.
*One of the Attorneys for Defendants Cliffs Natural Resources Inc., Joseph Carrabba, Laurie Brlas, Terry Paradie, and David B. Blake*